**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| FRESENIUS USA MANUFACTURING, INC.<br><br><br>Plaintiff,<br><br>v.<br><br><br>MICAH MUCH,<br><br><br>Defendant. | CIVIL ACTION NO. _____ |

**COMPLAINT FOR EQUITABLE RELIEF AND DAMAGES**
**AND JURY DEMAND**

Plaintiff Fresenius USA Manufacturing, Inc. ("Plaintiff") by and through its attorneys, for its Complaint for Equitable Relief and Damages against Defendant Micah (Mike) Much ("Defendant" or "Much"), alleges as follows upon personal knowledge as to its own acts and upon information and belief as to all other matters:

**INTRODUCTION AND NATURE OF THE ACTION**

This action arises out of Much's breach of a series of agreements he signed in exchange for participating in long-term incentive plans – all entitled, Employee Confidentiality, Assignment and Protective Covenants Agreement (each an "Agreement") and dated November 28, 2022, August 1, 2023, July 25, 2024, and July 28, 2025. Copies of the Agreements are attached as Exhibits A through D (in chronological order). Most recently, Much was employed as the Vice President Supply Chain Americas, responsible for meeting quality, safety, compliance, service, management and financial objectives for the North and Latin American distribution operation and planning functions. In this role, Much oversaw distribution centers, delivery operations and

supporting organizations in North America and Latin America for Fresenius Medical Care and its affiliated entities, including Plaintiff (collectively, "FME"). As of his resignation from employment, Much also supervised approximately 463 employees (directly or indirectly), 270 of which are based in the United States. Because of his executive role within the supply chain, Much was privy to and participated in establishing long-term strategies for FME in manufacturing, products, distribution and sales.

On July 16, 2026, after vesting in a retention bonus, Much tendered his resignation from employment, originally effective July 30, 2026, but unilaterally and without notice accelerated to July 24, 2026. Much has accepted the position of Executive Vice President and Chief Supply Chain Officer with FME's direct competitor, Vantive US Healthcare LLC and/or its affiliated entity ("Vantive") (www.vantive.com), a global medical technology company that specializes in kidney disease and dialysis with a focus on the home market and intensive care unit market – a primary competitor of FME.

Much's employment by Vantive unquestionably violates the express terms of the post-employment protective covenants in the Agreements he entered into in connection with his employment with Plaintiff. Much's competitive activities are improper competition, and the harm to Plaintiff is immediate and irreparable. Much's actions severely imperil FME's trade secrets and confidential information, as it is inevitable that he would disclose such information to his new employer, Vantive, and they further imperil FME's goodwill.

## PARTIES

1.      Plaintiff is a corporation organized under the laws of the State of Delaware with its principal place of business at 920 Winter Street, Waltham, Massachusetts.

2.      Defendant is an individual who, upon information and belief, resides in Cresson, Texas.

## JURISDICTION AND VENUE

3.      Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1332(a) because there exists complete diversity between the parties and the amount in controversy exceeds $75,000.  The Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiff asserts claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA").

4.      Personal jurisdiction exists over Much under M.G.L. c. 223A §§ 1 and 3 because Much expressly agreed that the Agreements shall be governed by Massachusetts law, and he submitted to the exclusive jurisdiction of the United States District Court for the District of Massachusetts.   (Agreements §§ 7 and 8).   Further, Much transacted business in the Commonwealth of Massachusetts, including but not limited to being employed by Plaintiff, a Massachusetts entity, executing the Agreements with Plaintiff, and visiting corporate headquarters and transacting business in Waltham, Massachusetts, most recently in June 2026.

5.      Venue is proper pursuant to 28 U.S.C. § 1391.  The Agreements provide that the parties submit to the exclusive jurisdiction of the United States District Court for the District of Massachusetts, and Much waived any objection to the laying of venue in this Court.  (Agreements § 8).

## FACTUAL ALLEGATIONS

*Fresenius Medical Care's Business*

6.      Fresenius Medical Care and its global affiliates are a leading provider of products and services for people with chronic kidney failure.  Around 4.5 million patients with this disease worldwide regularly undergo dialysis treatment.  Dialysis is a vital blood cleansing procedure that substitutes the function of the kidney in case of kidney failure.

7.      Among the types of treatments, peritoneal dialysis (PD) uses dialysis fluid and the lining of the patient's abdomen, called the peritoneal membrane, to filter the blood inside the

3

patient's body.  PD can be performed in a patient's own home daily.  Hemodialysis (HD) filters blood using a machine and a synthetic membrane, called a dialyzer, and is usually (but not always) performed in a clinic or other medical or hospital setting.

8.      FME distributes the products that are needed by its dialysis customers (*e.g.*, clinics, hospitals and patients treating at home).  The items are a comprehensive range of medical devices, related supplies and renal pharmaceuticals – including dialysis machines, reverse osmosis systems, dialyzers, dialysate (a cleansing fluid), prescription drugs, dialysis bloodlines (specialized, sterile tubing sets that connect vascular access to the hemodialysis machine) and all necessary accessories (*e.g.*, surgical masks, gloves, etc.).  Care Enablement manufactures many of the items and purchases others from third-party sources.

9.      Care Enablement is an organizational division within FME through which FME centralizes its healthcare products business, including research and development, manufacturing, supply chain and commercial operations as well as supporting functions, such as regulatory and quality management.

10.      Storage and distribution are key factors in controlling costs for Care Enablement. By way of example, for some products, the storage and distribution of the product can be more costly than manufacturing and/or purchasing the product itself.  This is particularly true for the PD business for in-home patients, for which Vantive is Care Enablement's primary competitor.

11.      In addition to asking employees to sign agreements which contain covenants that protect trade secrets and confidential information and require the return of property upon termination, Plaintiff takes the following measures to protect its trade secrets and confidential information: (a) prohibiting the use of FME materials for purposes not directly related to its business, or the removal or borrowing of its property without permission; (b) using badge IDs to

restrict access to and within its facilities; (c) prohibiting improper use of its computer systems; (d) restricting access to its computerized information through the use of passwords; and (e) restricting access to its computerized company information based on each individual employee's "need to know" the particular information.

*Much's Employment*

12.    On September 30, 2022, Plaintiff hired Much as its Vice President North America Supply Chain.  On or about January 5, 2025, Much's job title was updated to Vice President Supply Chain Americas.

13.    Much reported to Brett Beck ("Beck"), Senior Vice President Supply Chain Management at the time of hire and at all times while Much was employed by Plaintiff.

14.    At the time he was hired, Much had previous experience in supply chain operations and logistics, but had never worked in the kidney care industry.  Working at Plaintiff was Much's first position in the kidney care industry.

15.    Upon information and belief, prior to joining Plaintiff, Much had been employed for the previous 14 years with Collins Aerospace, an aviation and defense technology company.

16.    Plaintiff and Much entered into a Retention Agreement dated October 1, 2024, whereby Much received a retention bonus in the amount of $50,000, payable on the first regular payroll date following June 30, 2025, and a second retention bonus in the amount of $70,000 on the first regular payroll date following June 30, 2026.  Plaintiff made the retention bonus payments to Much, as contracted.

*Much's Access to Confidential Information and Customer Goodwill of FME*

17.    Much managed the supply chain budget and oversaw the processing and delivery of products to more than 30,000 clinics, hospitals and home patients.  He interacted with all corporate departments and suppliers to identify and implement strategies, supported sales in

generating new business and worked on the long-term strategy for supply chain operations, among other duties.  Because of the nature of FME, the products, their storage and delivery also must meet regulatory requirements and temperature control requirements for medical devices, medical accessories and prescription drugs.

18.     As the head of supply chain for the Americas, Much was privy to all of Care Enablement's current and future products and strategies.  Because he was responsible for ensuring that items are available, stocked and delivered in a timely manner, Much had to know what was coming in the pipeline so his supply chain team could be ready to accommodate new items and anticipated increases/decreases in volume of Care Enablement's products and customer needs.

19.     While employed, Much learned extensive confidential information and trade secrets of FME, including for example, the FME's supply chain operations, logistics strategies, corporate strategies, product launches, manufacturing, sourcing initiatives, inventory, commercial plans, pricing, cost-reduction, vendor relationships, operational vulnerabilities, cost-reduction efforts and long-range business objectives and strategic planning.

20.      For example, from June 8, 2026, through June 12, 2026, Much led a strategic-planning meeting involving his direct reports called the Americas Supply Chain ("ASC") Strategy Leadership Offsite meetings at FME's headquarters in Waltham, Massachusetts.  The goal of the ASC Strategy Leadership Offsite meeting was to develop a clear picture of the next three to five years with a view as to where each function is headed and to prioritize the portfolio of projects. To prepare for the ASC Strategy Leadership Offsite, Much asked his direct reports to create presentations discussing their areas of responsibility, identifying current status of operations and proposing strategic initiatives.  Among the types of information shared at this meeting include: Americas Supply Chain 2026-2031 strategic objectives; a five-year Global Manufacturing and

Supply Chain (MSC) plan entitled MSC 2030 that involves cost structure, performance, technology enablement, advanced analytics, inventory planning support and risk strategy and management; transportation planning from 2026 through 2029; Program Management Office strategies through 2030; Latin America (LATAM) strategic initiatives from 2026 through 2029; and human resources strategies and employee engagement plans. The presentations specifically identified Vantive as a competitor.

21.    Much also participated in the Executive Manufacturing Supply Chain (MSC) Project Review at which FME's highest-level corporate strategies and projects are discussed and planned out. At the May 21, 2026, MSC Project Review, Much discussed confidential projects within FME. Projects discussed at the May 21, 2026, MSC Project Review attended by Much include (a) confidential business strategies regarding high-volume hemodiafiltration ("HVHDF"), a dialysis treatment modality that is new to the United States and is presently being made available to patients through the use of new in-center dialysis machine, the 5008X CareSystem; (b) a future product offering not known publicly; and (c) the transition of manufacturing for certain prescription items and FME's efforts and status with the Food and Drug Administration related to these products for PD in the United States market.

22.    Much also was an integral participant of the Executive Meetings for Sales, Inventory, and Operations Planning (known as "SIOP" or "S&OP"), a monthly meeting at which executives, including Much, discussed the overall supply chain network and costs. During these meetings, and as a general responsibility of Much, he was exposed to information about upcoming product launches, pipelines, margins, costs and profitability, including the PD business. The most recent SIOP Meeting from May 2026 included a discussion of the 5008X update, and PD results and forecasts through the end of 2027, among other topics.

23.    In connection with Much's participation in FME's high-level corporate priority project, referred to as the PD Turnaround Project, Much reviewed and discussed confidential information and strategies related to supply chain, manufacturing and commercial sales issues impacting the PD Business, including, without limitation, current and future products and strategies, product launch strategies, market analyses including growth analyses, financial analyses (profitability, costs, pricing, margins, etc.), vendor relationships, FME's weaknesses and strengths within the business, and competitive analyses.  This specifically included confidential analyses of Care Delivery's PD Business and its strategies in relation to Vantive.

24.    Much was also exposed to key financial performance information and budgets.

25.    Much was exposed to confidential strategies and information globally, and participated in high-level decision-making globally and not just limited to the Americas.

26.    Much had relationships with FME key vendors and knows the terms of confidential contracts and relationships that, if known by Vantive, could be used to Vantive's competitive advantage.

27.    Much was involved in forming strategies for working with FME's top customers to whom FME sells machines and equipment competitive to those of Vantive.  For instance, in 2026, Much participated in tours with a large FME customer in the Dallas area and the Denver area, at which he emphasized the competitive advantage FME has because of its supply chain operations and strategies.

*Much's Post-Employment Obligations*

28.    In connection with his receipt of a series of awards under FME's long-term incentive plan awards ("LTIP"), Much executed and became bound by a series of Agreements

8

dated November 28, 2022, August 1, 2023, July 25, 2024, and July 28, 2025, true and accurate copies of which are attached as Exhibits A through D.

29. Much received consideration for signing each Agreement in the form of the LTIP participation.

30. Each of the Agreements explains that it does not supersede prior restrictive covenants and, therefore, each of the Agreements remains enforceable. See e.g., Agreement 7/28/25 (Exhibit D) at § 10 ("this Agreement is intended to be in addition to (and not replace) any other agreement(s) I have entered into which address(es) post-employment obligations, such as agreements concerning nondisclosure of Confidential Information or Trade Secrets, nonsolicitation, noncompetition and intellectual property…").

31. In the Agreements, Much agreed to various post-employment restrictive covenants. As set forth in more detail in each of the Agreements, Much agreed that during or after his employment, he would not use or disclose any confidential information of FME (Section 3(a)), and that he would return to FME all FME property (including electronic information) in his possession upon the termination of his employment. See e.g., Agreement 7/28/25 (Exhibit D) at Section 3(c).

32. In the Agreements, Much agreed that for twelve (12) months following the termination of his employment, he would not work for or in furtherance of any Competing Business within the Restricted Area in circumstances where his duties, services and/or responsibilities are the same as or substantially similar to any duties and responsibilities he performed during the Look Back Period. See Agreement 11/28/22 (Exhibit A), Agreement 8/1/23 (Exhibit B), Agreement 7/25/24 (Exhibit C), and Agreement 7/28/25 (Exhibit D) at Section 5(b). The capitalized terms are defined in each Agreement.

33.     The "Restricted Area" is defined in the Agreements as "the territory or territories or other geographic areas in which [FME] does business and as to which I provided services or had a material presence or influence, and/or about which I learned Confidential Information. Given my role with [FME], I agree that the Restricted Area may be defined for me to be the entire United States (including any territories of the United States)." Exhibits A and B at Section 5(a)(vi) and Exhibits C and D at Section 5(a)(v).

34.     Through Sections 5(c)-(e) of the Agreements, Much agreed not to solicit customers, patients, physicians, vendors, and employees for a one (1) year period after the termination of his employment. *See* Exhibits A-D.

*Much Resigns to Join Vantive*

35.     Much was interviewing for employment at Vantive in April or May 2026, and possibly earlier.

36.     In or around early June 2026, Much returned to FME his FME-issued cell phone and informed FME that he would be using his personal phone for business thereafter. By doing so, Much gained access to FME confidential information, emails and contacts on his personal cell phone at a time when he knew he was going to a competitor, or at least had reason to believe he may be going to a competitor.

37.     Much continued to attend high-level meetings and have discussions within FME concerning FME's confidential business strategies and confidential information at the time he was interviewing at Vantive and at the time he knew he was going to or had accepted employment at Vantive.

38.    On July 16, 2026 – days after receiving a $70,000 retention bonus – Much emailed Beck to submit his "formal notice of [his] resignation" from employment, with a final date of employment of July 30, 2026.

39.    On July 24, 2026, despite his promise to remain employed through July 30, 2026, to assist in the transition of his duties if needed and without any advance notice, Much unilaterally decided to accelerate his resignation date to July 24, 2026.

40.    In connection with his resignation from employment, Much informed Plaintiff that he had accepted an executive-level position with Vantive.  Much did not disclose what Much's title would be at Vantive, but he did state he would be responsible for, among other duties, overseeing Vantive's logistics and supply chain operations, among other responsibilities.

41.    Upon information and belief, Vantive intends to employ or has begun onboarding Much in a position responsible for procurement, manufacturing, fulfillment and logistics functions for Vantive's global footprint, including North America and Latin America.

42.    Upon information and belief, Vantive intends to employ or has begun onboarding Much as its Executive Vice President and Chief Supply Chain Officer, reporting directly to Vantive's Chief Executive Officer.

43.    Upon information and belief, Vantive intends to employ or has recently begun onboarding Much within the Restricted Area in violation of his obligations under the Agreements.

44.    Upon information and belief, Much's duties, services and/or responsibilities at Vantive are, or will be, the same as or substantially similar to any duties and responsibilities he performed for FME during the Look Back Period and/or in a position where Much is likely or probable to use or disclose Confidential Information of FME in performing his duties for Vantive.

11

45. According to its press release, "Vantive delivers innovative products, digitally-enhanced solutions and advanced services to support dialysis at home and in the clinic, as well as critical care therapy to support the kidney and other vital organs in an intensive care unit (ICU) setting." *See  Baxter Kidney Care is Now Vantive, A New Standalone Vital Organ Therapy Company,* available at https://www.vantive.com/news/press-releases/baxter-kidney-care-now-vantive-new-standalone-vital-organ-therapy-company (last accessed July 30, 2026).

46. Vantive is a direct competitor of FME and Plaintiff.

47. Vantive is a "Competing Business" within the meaning of the Agreements.

48. At the time of his resignation from employment at Plaintiff, Much knew that Vantive was a direct competitor of FME.

49. Upon information and belief, while employed at Plaintiff, Much retained access to FME Confidential Information after the end of his employment.

50. Following his resignation from employment, Much remained in possession, custody and control of FME Confidential Information and property.

51. Permitting Much to be employed by Vantive (or to continue to be employed by Vantive, if he has started) would give Vantive an unfair competitive advantage, because it is inevitable that Much will, in the performance of his duties for Vantive, use and disclose FME's trade secrets and confidential information and harm its goodwill.

## COUNT ONE
## BREACH OF CONTRACTS

52. Plaintiff repeats and re-alleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

53. There exist four (4) valid and binding Agreements between Plaintiff and Much, as attached as Exhibits A through D.

54.    Each Agreement was made for valid consideration.

55.    Each Agreement is reasonable, consonant with public policy, and is necessary to protect the legitimate business interests of Plaintiff and FME.

56.    Each Agreement is reasonably limited in scope and narrowly tailored to protect Plaintiff's and FME's legitimate business interests.

57.    Plaintiff and FME have a clearly ascertainable right to protect its goodwill, confidential business information and trade secrets and to enforce the Agreements' restrictive covenants.

58.    Much breached and/or will breach his contractual obligations by providing services to and on behalf of Vantive and by virtue of the nature of his employment with Vantive.

59.    Plaintiff will suffer, and continue to suffer, irreparable harm as a result of this breach, and threatened breach.  Plaintiff is threatened with losing the value of its trade secrets and confidential information and certain goodwill.

## COUNT TWO
### MISAPPROPRIATION OF TRADE SECRETS – MTSA

60.    Plaintiff repeats and re-alleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

61.    FME confidential information constitutes trade secrets within the meaning of the Massachusetts Trade Secrets Act, M.G.L. c. 93, §§ 42, 42A-42G ("MTSA").

62.    FME's trade secrets derive independent economic value from not being generally known to, or readily ascertainable by proper means by, the public, and other persons can obtain economic value from their disclosure and use.

63.    At all relevant times, Plaintiff has taken reasonable and necessary measures to safeguard the secrecy and confidentiality of its information and business intelligence, including

13

trade secrets.  Such measures include, without limitation, promulgating corporate policies and requiring employees to contractually agree not to disclose confidential information.

64.     Much had substantial and ongoing access to trade secrets as a result of and during his employment with Plaintiff.

65.     Much gathered and exposed himself to trade secrets even when he was in the process of obtaining employment with Vantive.

66.     Much took and retained trade secrets after he accepted employment at Vantive.

67.     Much's memory retains FME's trade secrets after he ceased being employed by Plaintiff.

68.     Upon information and belief, Much disclosed trade secrets to Vantive and/or has misappropriated or threatens to misappropriate trade secrets through his employment with Vantive in violation of the MTSA.

69.     Much misappropriated and/or threatens to misappropriate trade secrets through improper means.

70.     Much's conduct was willful and malicious within the meaning of M.G.L. c. 93 § 42B(b).

71.     By misappropriating and/or using trade secrets, Much has created or will create an unfair advantage for Vantive in competing with FME.

72.     As a result of Much's violation of the MTSA, Plaintiff has been injured and will continue to suffer damages.

## COUNT THREE
### MISAPPROPRIATION OF TRADE SECRETS – DTSA

73.     Plaintiff repeats and re-alleges all of the allegations contained in the foregoing paragraphs as if fully set forth herein.

14

74. FME confidential information constitutes trade secrets within the meaning of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA").

75. FME's trade secrets derive independent economic value from not being generally known to, or readily ascertainable by proper means by, the public, and other persons can obtain economic value from their disclosure and use.

76. The trade secrets are related to a product or service used in, or intended for use in, interstate or foreign commerce.

77. At all relevant times, Plaintiff has taken reasonable and necessary measures to safeguard the secrecy and confidentiality of its information and business intelligence, including trade secrets. Such measures include, without limitation, promulgating corporate policies and requiring employees to contractually agree not to disclose confidential information.

78. Much had substantial and ongoing access to trade secrets as a result of and during his employment.

79. Much gathered and exposed himself to trade secrets even when he was in the process of obtaining employment with Vantive.

80. Much took and retained trade secrets after he accepted employment at Vantive.

81. Much's memory retained trade secrets after he ceased being employed by Plaintiff.

82. Upon information and belief, Much disclosed trade secrets to Vantive and/or has misappropriated or threatens to misappropriate trade secrets through his employment with Vantive in violation of the DTSA.

83. Much misappropriated and/or threatens to misappropriate trade secrets through improper means.

84.    Much's conduct was willful and malicious.

85.    By misappropriating and/or using trade secrets, Much has created an unfair advantage for Vantive in competing with FME.

86.    As a result of Much's violation of the DTSA, Plaintiff has been injured and will continue to be damaged.

## REQUESTS FOR RELIEF

**WHEREFORE,** Plaintiff requests that this Court:

1.    Enter an order that Much and all parties in active concert or participation with him be preliminarily and permanently enjoined from (a) performing services for Vantive anywhere in the United States for one (1) year following the termination of his employment at Plaintiff, (b) disclosing or using any trade secrets, confidential information, or proprietary information in violation of the Agreements and applicable law, (c) destroying, discarding or altering, directly or indirectly, any FME information or property, and (d) otherwise engaging in any conduct which violates an Agreement.

2.    Enter an order that Much and all parties in active concert or participation with him be preliminarily and permanently enjoined for twelve (12) months following termination from employment at Plaintiff from (a) soliciting or communicating with a Covered Customer, Patient or Physician for the purpose of (i) selling or providing the Covered Customer, Patient or Physician a Competing Product or Service, or (ii) inducing or encouraging the Covered Customer, Patient or Physician to end, or change to FME's detriment the customer's, patient's or physician's relationship with FME; (b) soliciting or communicating with a Covered Supplier or Vendor for the purpose of inducing or encouraging the Covered Supplier or Vendor to end or change to FME's detriment the supplier's or vendor's relationship with FME; (c) soliciting or communicating with an employee of FME for the purpose of inducing or encouraging the employee to leave the

employment or to change an existing business relationship to the detriment of FME; and (d) helping another person or entity hire away an FME employee (as all capitalized terms are defined in the Agreements).

3.      Enter an order that Much and all parties in active concert or participation with him be required to return to Plaintiff all originals and all copies of FME's trade secrets, confidential information, proprietary information, or other property that may exist, in any form, that are in his possession, custody or control.

4.      Enter an order that Much and all parties in active concert or participation with him be required to explain any use or disclosure of trade secrets, confidential information, or proprietary information, in sufficient detail to enable Plaintiff to track down and recover all misappropriated information.

5.      Award Plaintiff its reasonable attorney's fees and costs incurred in successfully enforcing the Agreements, as set forth in Section 6 of the Agreement.

6.      Award Plaintiff damages available under the legal theories advanced in an amount to be determined at trial.

7.      Award any such other and further relief that the Court deems fit and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims raised in its Complaint that are so triable.

17

Respectfully submitted,

FRESENIUS USA MANUFACTURING, INC.

By its attorneys,

*/s/ Jeffrey S. Siegel*
Jeffrey S. Siegel (BBO# 647148)
Sean P. O'Connor (BBO# 673835)
Robert Papandrea (BBO# 711504)
MORGAN, BROWN & JOY, LLP
28 State Street, 16th Floor
Boston, MA 02109
(617) 523-6666
(617) 367-3125 (fax)
jsiegel@morganbrown.com
soconnor@morganbrown.com
rpapandrea@morganbrown.com

Dated: August 5, 2026