**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| FRESENIUS USA MANUFACTURING, INC.<br><br>Plaintiff,<br><br>v.<br><br>MICAH MUCH,<br><br>Defendant. | CIVIL ACTION NO. 1:26-cv-13572 |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

(Hearing Requested)

FRESENIUS USA MANUFACTURING, INC.

Jeffrey S. Siegel (BBO# 647148)
Sean P. O'Connor (BBO# 673835)
Robert Papandrea (BBO# 711504)
MORGAN, BROWN & JOY, LLP
28 State Street, 16th Floor
Boston, MA 02109
(617) 523-6666
(617) 367-3125 (fax)
jsiegel@morganbrown.com
soconnor@morganbrown.com
rpapandrea@morganbrown.com

Dated: August 5, 2026

## I. INTRODUCTION

Plaintiff Fresenius USA Manufacturing, Inc. ("Plaintiff") submits this Memorandum of Law in Support of its Motion for a Temporary Restraining Order and Preliminary Injunction to prevent the immediate and irreparable harm from the threatened misuse of its most sensitive confidential information and trade secrets by its former Vice President Supply Chain Americas, Micah (Mike) Much ("Defendant" or "Much"), who is imminently onboarding with Plaintiff's direct competitor, Vantive US Healthcare LLC and/or its affiliated entities ("Vantive"). Plaintiff seeks to enforce the non-competition, non-solicitation and confidentiality provisions contained in the Employee Confidentiality, Assignment and Protective Covenants Agreements (each an "Agreement") dated November 28, 2022, August 1, 2023, July 25, 2024, and July 28, 2025, that it entered into with Much in exchange for his participation in long-term incentive plans.[1] Plaintiff further brings claims under the Massachusetts Trade Secrets Act, M.G.L. c. 93, § 42 *et seq.* ("MTSA") and the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* ("DTSA").

When he was hired by Plaintiff nearly four years ago, Much had never worked in the kidney care industry. Much was most recently employed as Vice President Supply Chain Americas of Plaintiff, a division of Fresenius Medical Care ("FME").[2] In his role, Much was a trusted, highly compensated executive responsible for FME's supply chain infrastructure earning more than $645,000 in 2025. He was an executive leader primarily responsible for the strategic vision and operational excellence of FME's supply chain operations, including responsibilities for meeting quality, safety, compliance, service, management and financial objectives for the

---

1 The Agreements are submitted as Exhibits A through D of the Complaint. They are authenticated through the Declaration of Heather Richins In Support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction ("Richins Dec.").

2 "FME" refers collectively to Plaintiff Fresenius USA Manufacturing, Inc., and its parent company Fresenius Medical Care Holdings, Inc. and any related affiliate.

North and Latin American distribution operations and planning functions. Much was the architect for the future supply chain and distribution model strategies for FME in the Americas.

Yet, Much's knowledge of FME's confidential information and input was not limited to its supply chain operations. Because of his responsibilities and their intersection with multiple aspects of FME's business (*e.g.*, manufacturing, the supply chain, and sales), Much necessarily had access to FME's most sensitive confidential information and trade secrets concerning supply chain operations, logistics strategies, transportation strategies, future products and launches, manufacturing, sourcing initiatives, inventory, commercial plans, pricing, vendor relationships, operational vulnerabilities, cost-reduction efforts, long-range business objectives and other company strategies in the Americas and globally. Much was a key executive entrusted with translating FME's confidential future product and commercial strategies into operational plans.

For months, Much exploited his access to FME's confidential information by continuing to gain insight into its highly strategic plans while simultaneously planning to join Vantive, FME's direct competitor. Much was pursuing employment with Vantive in May 2026, if not earlier. Much delayed resigning from Plaintiff until after leading an off-site retreat with his team in June in which the team prioritized all of their future projects. Much is joining Vantive as its Executive Vice President and Chief Supply Chain Officer – a role that overlaps with his work at Plaintiff. Much's employment for Vantive would be and is in direct violation of the Agreements. Notwithstanding Plaintiff's concerns in pre-litigation letters to Much and Vantive, Vantive and Much informed Plaintiff on July 31, 2026, that they intend to move forward with Much's onboarding imminently.

This Court should not permit Much to work for Vantive because: (1) it is prohibited by the Agreements; (2) he was privy to FME's confidential information and trade secrets, including

strategies directly related to FME's competition with Vantive; (3) it is impossible to divorce his knowledge of FME confidential information in another way, particularly for such a senior executive; and (4) he will inevitably disclose such information in the performance of his duties for Vantive. For the reasons set forth below and in the accompanying Declarations of Brett Beck, Almasa Lauredant, Brent Melancon, Heather Richins and Jeffrey S. Siegel, injunctive relief is warranted to enforce the Agreements and enjoin Much from employment at Vantive.

## II. FACTS[3]

### A. FME's Business and Vantive as a Direct Competitor

Fresenius Medical Care and its global affiliates are a leading provider of products and services for people with chronic kidney failure. (Richins Dec. ¶ 5). Around 4.5 million patients with this disease worldwide regularly undergo dialysis treatment. (*Id.*). Dialysis is a vital blood cleansing procedure that substitutes the function of the kidney in case of kidney failure. (*Id.*). FME supplies dialysis products to patients, dialysis clinics and hospitals, supporting peritoneal dialysis ("PD"), home dialysis, and in-center hemodialysis, as well as devices used in extracorporeal membrane oxygenation. (*Id.* at ¶ 6). Among the types of treatments, PD uses dialysis fluid and the lining of the patient's abdomen, called the peritoneal membrane, to filter the blood inside the patient's body. PD can be performed in a patient's own home daily.

[3] The facts are set forth in detail in the accompanying declarations, cited as "[Name] Dec." followed by the paragraph number (¶ ) and/or exhibit referenced ("Ex"). This memorandum sets forth information that is not a trade secret or confidential information. Exhibits referenced in the declarations may be subject to the contemporaneously filed Motion for Leave to File Selected Exhibits Under Impoundment ("Motion to Impound"). They will be filed upon the Court's ruling on the Motion to Impound. The proposed exhibits filed under impoundment will be heavily redacted to remove confidential information. Plaintiff has concerns that without appropriate protections, through litigation, Vantive would be able to review the content of the proposed exhibits as Vantive and Much share the same attorneys. (Siegel Dec. ¶ 4, Ex. C). With appropriate assurances in the form of a confidentiality order or otherwise, unredacted versions subject to impoundment will be made available.

Hemodialysis ("HD") filters blood using a machine and a synthetic membrane, called a dialyzer, and is usually (but not always) performed in a clinic or other medical or hospital setting. (Beck Dec. ¶ 7).

Care Enablement refers to FME's global medical device technology segment, which consolidates product research, manufacturing, supply chain and commercial operations to support dialysis treatments worldwide. (*Id*. at ¶ 10). It plans and distributes all products needed by its dialysis customers (*e.g.*, clinics, hospitals, and patients treating at home). (*Id*. at ¶ 8). These products include a comprehensive range of medical devices, related supplies and renal pharmaceuticals, including dialysis machines, reverse osmosis systems, dialyzers, dialysate, prescription drugs, dialysis bloodlines and necessary accessories such as surgical masks and gloves. (*Id*.). Care Enablement manufactures many of these items and purchases others from third-party sources. (*Id*.). To ensure the products are available and delivered to customers, Care Enablement operates and/or outsources operations to warehouses globally, including those in North and Latin America, and their storage and delivery must meet regulatory and temperature control requirements. (*Id*. at ¶¶ 9-10).

Vantive is the primary, direct competitor of Care Enablement with respect to products and services for PD business and critical care dialysis. (Beck ¶¶ 28-31; Melancon Dec. ¶ 9). Vantive similarly operates a supply channel through which it sources, stocks, stores and delivers its products to its patients and customers, and the companies directly compete in significant areas of strategic importance for the PD business and critical care dialysis. (Beck ¶¶ 11, 29-31). Vantive is specifically discussed as a key competitor during internal strategic meetings. (Beck Dec. ¶ 29; Melancon Dec. ¶¶ 10, 13-17).

### B. Much Was a Highly Compensated Executive with Access to FME's Confidential Information and Trade Secrets

Plaintiff hired Much effective September 30, 2022, as Vice President North America Supply Chain and became the Vice President Supply Chain Americas in January 2025. (Richins Dec. ¶ 14). Much's employment with Plaintiff was his first in the kidney care industry. (*Id*. at ¶ 15). As Vice President Supply Chain Americas, Much was a senior executive with significant compensation, earning over $645,000 in 2025. (*Id*. at ¶¶ 16-17).

Much was an executive leader primarily responsible for the strategic vision and operational excellence of FME's supply chain operations, including responsibilities for meeting quality, safety, compliance, service, management and financial objectives for the North and Latin American distribution operations and planning functions. (Beck Dec. ¶ 10; Richins Dec. ¶ 24). Much managed the supply chain budget and oversaw the processing and delivery of products to more than 30,000 clinics, hospitals, and home patients. (*Id*.). Within his organization, Much oversaw hundreds of employees across the United States, Canada, Brazil, Chile, Columbia, Ecuador, Mexico, Peru, and Uruguay. (Richins Dec. ¶ 25).

Much was the architect for the future supply chain and distribution model strategies for FME in the Americas. (Beck Dec. ¶ 10). His role required deep access to FME's confidential information and trade secrets. (Beck Dec. ¶¶ 12-27; Lauredant Dec. ¶¶ 5-14; Melancon Dec. ¶¶ 6-24). Because he was responsible for ensuring that items are available, stocked and delivered in a timely manner, Much had to know what was coming in the pipeline so his supply chain team could be ready to accommodate new items and anticipated increases/decreases in volume of Care Enablement's products and customer needs. (Beck Dec. ¶ 12). In his role, Much interacted heavily with corporate departments within FME, as well as outside suppliers and consultants in determining long-term strategy for the organization and making daily tactical decisions. (*Id*.). Much's knowledge and input shaped procurement and manufacturing decisions and strategy, as

well as supply chain logistics. (Melancon Dec. ¶ 6). Much worked on Care Enablement's global strategies, including dialyzer and equipment production capacities and limitations, technology advances, and strategies related to outsourcing targeting programs. (Beck Dec. ¶ 26).

Given the nature of Much's senior executive role, it is difficult to summarize all his responsibilities or the broad range of confidential information to which he was exposed and used. The submitted declarations (summarized in Section II. D.2), provide numerous examples of information he had access to through discussions and high-level, confidential projects, meetings and strategies through which he participated and/or was exposed. If known by a competitor, such confidential information would provide the competitor with an unfair advantage, allowing it to reap the rewards of these strategies while avoiding the investment FME makes into these efforts. (Beck Dec. ¶¶ 12-27, 30-31; Lauredant Dec. ¶¶ 5-14; Melancon Dec. ¶¶ 6-24).

### C. In Exchange for Significant Long-Term Incentive Awards, Much Agreed To Restrictive Covenants and to Safeguard FME Confidential Information

In connection with his receipt of awards under FME's long-term incentive plan awards ("LTIP"), Much agreed to be bound by a series of Agreements. (Richins Dec. ¶ 19). In the Agreements, Much agreed not to disclose FME's confidential information. *See* Agreements § 3. Much agreed to not engage in competitive employment for twelve (12) months following termination of his employment, *see* Agreements § 5(b), and not to solicit FME's customers, patients, physicians, vendors and employees for twelve (12) months following the termination of his employment. *See* Agreements § 5(c)-(e).[4]

### D. Much Exploited His Access to FME's Confidential Information and Trade Secrets While Planning to Join Vantive

---

[4] Much's restrictions on the solicitation of vendors are contained in the November 28, 2022, and August 1, 2023, Agreements (Complaint, Ex. A-B).

### *1. Much Pursued a C-Suite Position with Vantive and Resigned from FME*

Much was in discussions with Vantive starting in May 2026, if not earlier. A review of Much's calendar reveals that on May 5, 2026, he was scheduled to speak with a Vantive executive talent acquisition representative. (Richins Dec. ¶ 28). It further reflects meetings in May 2026 that appear to involve senior executives at Vantive, including its Chief Executive Officer, and travel to Chicago near Vantive's corporate headquarters. (*Id*. at ¶¶ 28-29). In June, Much, for the first time while employed by FME, decided to change to using his personal cell phone for work, thereby attempting to retain access to FME-related information after his (apparently planned) future resignation. (*Id*. at ¶ 27).

Shortly after Much received a $70,000 retention bonus, on July 16, 2026, Much resigned from his position and stated that he would be joining Vantive. (Beck Dec. ¶ 32; Richins Dec. ¶ 18). Upon disclosing his intent to join Vantive, Much's access to FME systems was immediately shut off. (Richins Dec. ¶ 33). Much stated that his role at Vantive, like his role at FME, would include oversight of Vantive's supply chain and logistics, but that his C-suite role would also have oversight of manufacturing and procurement. (Beck Dec. ¶ 32). Through pre-litigation communications, Much and Vantive's counsel represents that Much will "have some responsibility for the fulfillment and logistics functions at Vantive," in addition to being responsible for procurement and manufacturing operations globally. (Siegel Dec. ¶ 4, Ex. C).[5] Much may have started working at Vantive, or at least his onboarding is imminent. (*Id.*).

### *2. While Planning to Join Vantive, Much Continued to Receive FME Confidential Information and Participate in High-Level Confidential Strategy Discussions*

[5] Much provided two weeks' notice (through July 30, 2026) of his resignation, but later accelerated the resignation date to July 24, 2026. (Beck Dec. ¶¶ 32; Richins Dec. ¶¶ 32-34).

Despite planning to join Vantive in an executive level position directly competing with FME, Much continued to attend and participate in high-level meetings involving FME's confidential information and trade secrets right up through his resignation.

a. Americas Supply Chain Strategy Leadership Offsite Meetings

From June 8, 2026, through June 12, 2026, Much led a strategic-planning meeting involving his direct reports called the Americas Supply Chain ("ASC") Strategy Leadership Offsite meetings at FME's headquarters in Waltham, Massachusetts with the goal to identify and prioritize a three- to five-year plan for the organization. (Lauredant Dec. ¶¶ 7-14). Among the types of information shared at this meeting (and with Much generally) include: Americas Supply Chain 2026-2031 strategic objectives; a five-year Global Manufacturing and Supply Chain (MSC) plan entitled MSC 2030 that involves cost structure, performance, technology enablement, advanced analytics, inventory planning support and risk strategy and management; transportation planning from 2026 through 2029; Program Management Office strategies through 2030; Latin America (LATAM) strategic initiatives from 2026 through 2029; and human resources strategies. (*Id.*). The presentations specifically identified Vantive as a competitor. (*Id.*). The output of the meeting was a detailed Americas Supply Chain Strategy 2026-2031 that incorporated the strategies discussed and prioritized. (*Id.*). The MSC 2030 project is a global project that Much was critical in developing. (Beck Dec. ¶ 27).

b. PD Turnaround Project

FME has a high-level corporate priority project, referred to as the PD Turnaround Project, with the express purpose of focusing on the PD business for in-home patients, for which Vantive is a primary competitor. (Melancon Dec. ¶¶ 9-17). Given that supply chain, manufacturing and commercial sales are all critical elements of the PD business, Much, Troy McGhee (Senior Vice President Production Americas) and Brent Melancon (Senior Vice

President, Head of U.S. Commercial Operations) were key stakeholders in the PD Turnaround Project, which met quarterly and most recently on June 8, 2026. (*Id.*). Through these meetings, and in the advance preparation for them, they reviewed and discussed confidential information and strategies related to supply chain, manufacturing and commercial sales issues impacting the PD business, including, current and future products and strategies, product launch strategies, market analyses including growth analyses, financial analyses (profitability, costs, pricing, margins, etc.), vendor relationships, weaknesses and strengths within the business, and competitive analyses, including specifically strategies in relation to Vantive. (*Id.*).

c. <u>Executive Manufacturing Supply Chain (MSC) Project Review</u>

Much participated in the Executive Manufacturing Supply Chain (MSC) Project Review at which FME's corporate strategies and projects are discussed and planned out. (Beck Dec. ¶¶ 17-21). At the May 21, 2026, MSC Project Review, Much discussed confidential projects within FME. (*Id.*). Projects discussed at that meeting include (a) FME's confidential business strategies regarding high-volume hemodiafiltration, a dialysis treatment modality that is new to the United States; (b) a future product offering not known publicly; and (c) the long-term strategic manufacturing plans for certain prescription items and FME's efforts and status with the Food and Drug Administration related to these products for PD in the United States market. (*Id.*).

d. <u>Executive Meetings for Sales, Inventory and Operations Planning</u>

Much also was an integral participant of the Executive Meetings for Sales, Inventory, and Operations Planning ("<u>SIOP</u>"), a monthly executive meeting. (*Id.* at ¶¶ 22-23). Much described the agenda of one recent meeting as, "Executive focus on decisions needed and top risks reviewed" and described the group as covering "critical items." (*Id.*). During these meetings, and as a general responsibility of Much, he was exposed to information about upcoming product launches, pipelines, margins, costs and profitability, including for the PD business. (*Id.*). Because

SIOP planning requires inventory, storage and distribution planning years in advance, Much had visibility into future product releases two to three years before launch and the corresponding business plans necessary to support those products. (Lauredant Dec. ¶¶ 5, 10, 13).

e. Americas Supply Chain Operation Assessment

Much also led a monthly Americas Supply Chain Operational Assessment Meeting, including the meeting on June 23, 2026. (Beck Dec. ¶¶ 24-25). During that meeting, the group discussed the budgets and financial performance of the Americas supply chain, as well as the "Key Accomplishments", "Key Issues", "Key Deliverables" and "Strategic/Functional Plan Highlights." (*Id.*).

f. Much's Meetings and Involvement in Strategies for Key Customers and Vendors

Much also worked directly with top customers for dialysis equipment and related medical devices and pharmaceuticals. (Melancon Dec. ¶ 18). In late April 2026, Much participated in tours and meetings with leaders of FME's customer, DaVita Kidney Care ("DaVita"). (*Id.* at ¶¶ 19-21). During the meetings, Much and others discussed confidential issues concerning FME's relationship with the customer, FME's supply chain, operational performance reviews, economic valuations, and growth strategies/plans and products, among other topics. (*Id.*). On July 15, 2026 – the day before Much provided his notice of resignation – Much was planning a summit with leaders of DaVita for August 2026. (*Id.* at ¶ 22).

Much was also heavily involved in FME's relationships with key vendors such as Ryder System, Inc. ("Ryder"). (*Id.* at ¶ 24). Through internal discussions and meetings, Much gained knowledge of confidential information concerning FME's relationship with Ryder (and other vendors), including strategic planning, future operations, operational and financial analyses, weaknesses and strengths. (*Id*).

## III. THIS COURT SHOULD ENFORCE THE AGREEMENTS AND PROHIBIT MUCH FROM EMPLOYMENT WITH VANTIVE

### A. Legal Standard

Plaintiff is entitled to injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure because: (1) it has a substantial likelihood of success on the merits, (2) there is a significant risk of irreparable harm if the injunction is withheld; (3) the balance of hardships favors Plaintiff; and (4) there exists a fit (or lack of friction) between the injunction and the public interest. *Chiang v. Skeirik*, 529 F. Supp. 2d 166, 172 (D. Mass. 2007); *Bio-Imaging Technologies, Inc. v. Marchant*, 584 F. Supp. 2d 322, 326 (D. Mass. 2008).[6] At this stage, the Court need not conclusively determine the merits of the underlying claims with absolute assurance. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 2005).

### B. Plaintiff Is Likely to Succeed on the Merits of its Breach of Contract Claims

#### *1. The Agreements are Lawful and Enforceable*

Plaintiff will succeed in showing the noncompetition covenants in the Agreements are lawful and enforceable because they comply with each of the requirements of the Massachusetts Noncompetition Agreement Act. *See* Mass. Gen. Laws ch. 149, § 24L (the "MNAA" or "Section 24L").[7] In *DraftKings Inc. v. Hermalyn*, 732 F. Supp. 3d 84, 109 (D. Mass.), *aff'd*, 118 F.4th 416 (1st Cir. 2024) (quoting Section 24L(b)(i)-(viii)), this Court listed out the following eight requirements of enforceability under Section 24L, all of which are met in this case:

---

[6] Courts evaluate the same criteria in determining whether to issue a temporary restraining order or a preliminary injunction. *See Lagress v. Supreme Judicial Court for the State of Mass.*, 317 F. Supp. 2d 77, 81 (D. Mass. 2004).

[7] The Agreements all contain a choice of law provision selecting the laws of the Commonwealth of Massachusetts as applying. (Agreements § 7). The Agreements all provide that the parties agreed to submit to the "exclusive jurisdiction" of this Court. (Agreements § 8).

**(i)** The Agreements, which are in writing, inform the employee of the right to consult with counsel before signing, and are signed by the employer and employee (signature block). *See* Agreements § 14.

**(ii) and (vii)** The Agreements are supported by fair and reasonable consideration independent from the continuation of employment (factor ii) and mutually agreed upon consideration (factor vii) in the form of the LTIP awards, and provide at least a ten (10) business day notice period. *See* Agreements § 15; (Richins Dec. ¶¶ 19, 22). Much acknowledged that the LTIP awards constitute fair and reasonable consideration independent of continued employment. *See* Agreements §§ Introduction, 5(b); *see also, Cynosure LLC v. Reveal Lasers LLC,* No. CV 22-11176-PBS, 2022 WL 18033055, *9 (D. Mass. Nov. 9, 2022) (stock options constitute fair and reasonable consideration); *BNY Mellon, N.A. v. Schauer*, No. 201001344, 2010 WL 3326965, * 7 (Mass. Super. May 14, 2010) (in pre-MNAA case, finding stock award constituted sufficient consideration for restrictive covenants).

**(iii)** The Agreements are "no broader than necessary to protect" FME's trade secrets, confidential information, or goodwill, each of which constitute "legitimate business interests" because Much had extraordinary access to and regularly used FME confidential information and trade secrets to perform his executive level position and he met with FME customers directly.[8]

[8] FME takes commercially reasonable steps to preserve the secrecy of its confidential information, proprietary information, and trade secrets by, among other things, (a) prohibiting the use of confidential information for personal benefit or for any other purpose other than furthering the legitimate business interests of the company within the scope of their duties; (b) requiring employees with access to confidential information to sign an agreement prohibiting the disclosure of confidential information at the time of hire, and in connection with certain promotions or other programs; (c) prohibiting employees from connecting FME IT resources to unauthorized networks, providing unauthorized third parties FME's information, tampering with or circumventing FME or third-party IT security controls; (d) restricting access to its computerized information through the use of passwords and requiring employees to safeguard

Moreover, Much stipulated to the appropriateness of the restrictions through Section 5 of the Agreements. *See* Agreements § 5. *See also DraftKings*, 732 F. Supp. 3d at 109 (finding non-competition agreement protected a legitimate business interest given the employee's access to confidential information and employee's explicit agreement that the agreement was necessary to ensure the preservation, protection, and continuity of confidential information, trade secrets, and goodwill); *Cigna Corp. v. Bricker*, 103 F.4th 1336 (8th Cir. 2024) (employer demonstrated numerous and substantial protected interests in multiple lines or products and services, present and future, where former executive overseeing supply chain routinely participated in regular executive meetings in which key strategic information and decisions concerning all aspects of the employer's business were discussed).

**(iv)** The restrictions do not exceed twelve months in duration. *See* Agreements at § 5(b).

**(v)** The noncompetition covenants are "reasonable in geographic reach in relation to the interests protected." First, Much explicitly agreed in Section 5 of the Agreements that the protective covenants were reasonable. Second, the Agreement's geographic scope is reasonable because it prevents Much from working in the United States, which he acknowledges to be a geographic area in which Much provided services or had a material presence or influence within the last two years. Agreement § 5(a)(iv)-(vi), 5(b). *See* Section 24L(b)(v) (territory is presumptively reasonable); *Anaqua, Inc. v. Bullard*, No. SUCV201401491BLS1, 2014 WL 10542986, *5 (Mass. Super. July 24, 2014) ("In the era of global commerce, a worldwide restriction is not necessarily unreasonable *per se*") (emphasis in original), *aff'd*, 88 Mass. App. Ct. 1103 (2015); *Marcam Corp. v. Orchard*, 885 F. Supp. 294, 299 (D. Mass. 1995) (citation

---

their credentials; and (e) restricting access to confidential information to those with a "need to know" basis. (Richins Dec. ¶¶ 7-13; Beck Dec. ¶ 14). *See Jet Spray Cooler, Inc. v. Gifford,* 361 Mass. 835, 840, 282 N.E.2d 921, 925 (1972) (listing relevant factors to consider).

omitted) ("[a] geographic restriction is reasonable as long as it restricts a former employee from doing business in an area in which the company itself conducts business.").

Massachusetts courts have historically enforced geographical restrictions on a national and global basis. *Found. Med., Inc. v. Kittle*, Civ. A. No. 25-10298-RGS, 2025 WL 563067, *1 (D. Mass. Feb. 20, 2025) (nationwide); *Marcam*, 885 F. Supp. at 299 (upholding national restriction in pre-MNAA case where plaintiff competes on a national market); *Life Image, Inc. v. Brown*, Civ. A. No. SUCV201103764, 2011 WL 7443924, *6 (Mass. Super. Dec. 22, 2011) (granting plaintiff's motion for a preliminary injunction worldwide in pre-MNAA case where, by virtue of his position, defendant was "privy to the most sensitive [company] discussions and debates regarding [the company's strategic strengths and weaknesses and future planning."). More recently, the First Circuit affirmed the enforcement of a nationwide noncompete. *DraftKings Inc. v. Hermalyn*, 118 F.4th 416, 419 (1st Cir. 2024). Other senior executives at FME have been held to this restrictive territory by this Court. *See e.g., Nat'l Med. Care, Inc. v. Sharif*, No. CV 20-11460-MBB, 2020 WL 6318922, *15 (D. Mass. Sept. 2, 2020) (enjoining FME's former Senior Vice President, Chief Medical Officer from working for a competitor and stating that "[i]t is also difficult to conceive how all of the information stored in [the former executive's] memory can be set aside as he applies himself to a competitor's business and its products.") (internal quotations omitted); *Fresenius Management Services, Inc. v. Nottingham*, No.1:19-cv-11965-FDS, Order dated November 20, 2019 [Doc. 87] (Saylor, J.) (nationwide injunction).

**(vi)** The noncompetition covenants are "reasonable in the scope of proscribed activities in relation to the interests protected" because, given his executive position and knowledge, it would not be possible for Much to work for Vantive without trading upon the confidential information to which he has been privy. *Anaqua, Inc. v. Bullard*, No. 14-P-1514, 2015 WL 5055799 (Mass.

App. Ct. 2015) (Rule 1:28 decision) (affirming a preliminary injunction based on knowledge of confidential future strategies, made available during weekly executive management team teleconferences; "[i]t would be difficult, if not impossible, for [the former employee] to put such information out of his mind, particularly if he is motivated to turn in his best possible performance."). Much's employment with Plaintiff was his first in the kidney care industry, and much of the confidential information he received concerned projects and initiatives that relate directly to Vantive (Care Enablement's competitor). (Richins Dec. ¶ 15; Beck Dec. ¶¶ 21, 28-29). *See also Cigna Corp.*, 103 F.4th at 1344 (discussing significant risk associated with employee's knowledge of employer's inner workings and immediate future plans where new employer was former employer's largest direct competitor).

**(viii)** The noncompetition covenants are "consonant with public policy." "Massachusetts has a clear public policy in favor of strong protections for trade secrets." *Aspect Software, Inc. v. Barnett*, 787 F. Supp.2d 118, 131 (D. Mass 2011). "The public's interest is served by having two fairly competing companies" in markets. *Life Image,* 2011 WL 7443924 at *4. "[I]t is in society's best interest to recognize and enforce agreements which were voluntarily entered into and accepted." *Shipley Co., LLC v. Koslowski*, 926 F. Supp. 28, 30 (D. Mass. 1996).

***2. Much Breached the Agreements***

By accepting employment with Vantive, a direct competitor, Much breached Section 5(b) of the Agreements because he intends to work in furtherance of Vantive (a Competing Business) within the United States (the Restricted Area) in circumstances where his "duties, services and/or responsibilities are the same or substantially similar to [his] duties and responsibilities [he] performed for [FME]" during the last two years of his employment. Agreements § 5(b).

Vantive's proposed role for Much will "have some responsibility for the fulfillment and logistics functions at Vantive." (Siegel Dec. ¶ 4, Ex. C). Vantive further admits that Much will "be driving continuity, strategy and excellence across Vantive's fulfillment/logistics functions." (*Id.*). That is enough for this Court to enjoin Much from working at Vantive, as he acknowledges his duties would overlap with what he did for FME.

Through his counsel's letter, Much appears to contend that because his proposed position at Vantive is more senior or that he has duties in addition to what he performed for FME (that is, he is taking a bigger position in a smaller company), he is not in breach of the Agreements by taking the Vantive position. That argument misses the mark. First, his role at FME is, at a minimum, a subset of his proposed role at Vantive and thus, by definition includes "duties, services and/or responsibilities" he performed at FME. Second, by "driving… strategy" for Vantive, he is doing what he did for FME. As noted above, the supply chain must be involved in manufacturing and procurement and other aspects of the business so it can be prepared to operationalize corporate strategies. He knows – and planned – what FME plans to do in the future and that knowledge is inextricably entwined (and thus the same or substantially similar) with his C-level role at Vantive. *Sharif*, 2020 WL 6318922, at *7, 14 (CTO's role for competitor is "substantially similar" because of the "similarities between [competitor] USRC's and [FME'] businesses and the extensive nature of Dr. Sharif's information technology work at [FME]."); *Frequency Therapeutics, Inc. v. Weber,* No. SUCV20180347-BLS2, 2018 WL 6933369, *2 (Nov. 28, 2018) (employee's high-level knowledge rendered a "carve[d] out" role that purported to avoid overlap with his prior employer's knowledge insufficient to protect former employer).

Accepting a senior executive role with Vantive is "likely or probable," in fact inevitable, to result in the use or disclosure of confidential information. *CVS Pharmacy, Inc. v. Lavin*, 951 F.3d 50, 59 (1st Cir. 2020) (it "strains credulity to think that a top-echelon executive . . . could develop a strategy for [competitor] without dipping into [former employer's] knowledge."). It is impossible to understand how Much would have a role for Vantive without using FME's confidential information to impress Vantive. *Sharif*, 2020 WL 6318922 at *15. "What [Much] knows about [FME] is bound to influence what he does for [Vantive], and to the extent it does, [FME] will be disadvantaged." *Marcam*, 885 F. Supp. at 297.

**C. Plaintiff Is Likely to Succeed on the Merits of its MTSA and DTSA Claims**

Violations of the MTSA and the DTSA occur where: (i) there is the existence of a trade secret; (ii) the plaintiff took reasonable steps to protect the trade secret's confidentiality; and (iii) the defendant misappropriated the trade secret. *Gratuity Sols., LLC v. Toast, Inc.*, 812 F. Supp. 3d 141, 148-150 (D. Mass. 2025); *Milliman, Inc. v. Gradient A.I. Corp.*, 651 F. Supp. 3d 438, 442 (D. Mass. 2023); *T.H. Glennon Co., Inc. v. Monday*, No. CV18-30120-WGY, 2020 WL 1270970, *13 (D. Mass. Mar. 17, 2020); *Bose Corp. v. Goldstein*, No. 19-CV-11707-ADB, 2019 WL 7565384, *3 (D. Mass. Oct. 23, 2019). Both the MTSA and DTSA provide alternative grounds for misappropriation, including: (i) the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means"; *or* (ii) the "disclosure or use of a trade secret of another without express or implied consent by a person who ... used improper means to acquire knowledge of the trade secret …" M.G.L. c. 93 § 42A; 18 U.S.C. § 1839; *see also Gratuity Sols., LLC*, 812 F. Supp. 3d at 150; *Milliman, Inc.*, 651 F. Supp. 3d at 442; *Vicarious Surgical Inc. v. Tragakis*, 2284CV02321-BLS2, 2023 WL

3304305, * 4 (Mass. Super. Apr. 27, 2023). The MTSA further provides for injunctive relief for "[a]ctual *or* threatened misappropriation[.]" M.G.L. c. 93 § 42A(a).

Plaintiff has demonstrated the existence of trade secrets in this action that are not generally known, or readily ascertainable through proper means, outside of FME. They are valuable to FME and would be valuable to Vantive. Plaintiff has taken reasonable steps to protect the secrecy of its trade secrets. Much continued gaining information about FME after he knew he was going to join a competitor and Much's employment with Vantive constitutes misappropriation or threatened misappropriation. *See Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 240 (D. Mass. 2011). "'[T]he fact that no list or paper was taken does not prevent the former employee from being enjoined if the information which he gained through his employment and retained in his memory is confidential in nature.'" *Fid. Brokerage Servs., LLC v. Callinan*, No. 1884CV02098BLS1, 2019 WL 1576097, *5 (Mass. Super. Feb. 11, 2019) (quotation omitted).[9]

**D. Plaintiff Will Suffer Irreparable Harm**

Plaintiff will suffer substantial irreparable harm if injunctive relief is not granted. Much acknowledged that the current circumstances constitute irreparable harm through Agreements § 6. *See also, Tuckerbrook Alternative Invs. v. Banerjee*, Civ. A. No. 08-10636-PBS, 2008 WL 2356349, *4 (D. Mass. June 4, 2008) (acknowledgement demonstrates irreparable harm).

Even absent the contractual clause, the breach of a noncompete agreement in connection with trade secret concerns triggers a finding of irreparable harm. *Cynosure*, 2022 WL 18033055

[9] Misappropriation under the DTSA may be established with the theory of inevitable disclosure. *Inventus Power, Inc. v. Shenzhen Ace Battery Co.*, No. 20cv3375, 2020 WL 3960451, *11 (N.D. Ill. July 13, 2020) ("The DTSA allows courts to grant injunctions… for 'threatened' misappropriation … which can be done by demonstrating the inevitability of trade secret disclosure[.]"); *see also Molon Motor & Coil Corp. v. Nidec Motor Corp.*, No. 16C03545, 2017 WL 1954531, *5 (N.D. Ill. May 11, 2017).

at * 15 (irreparable harm found where departing employees had access and knowledge regarding sales, marketing, strategy development and customers that can be used to harm the former employer); *Lombard Med. Tech. v. Johannesen, et al.,* 729 F. Supp. 2d 432, 442 (D. Mass 2010); *Marcam*, 885 F. Supp. at 297("[i]t is difficult to conceive how all of the information stored in [employee's] memory can be set aside as he applies himself to a competitor's business and its products."); *C.R. Bard, Inc. v. Intoccia*, Civ. A. No. 94-11568-Z, 1994 WL 601944, *3 (D. Mass. Oct. 13, 1994) (finding irreparable harm where "project manager of its major project joins its competitor").

Plaintiff will also suffer irreparable harm through the misappropriation of its goodwill. The substantial goodwill FME developed with key customers (*e.g.*, DaVita Kidney Care) and vendors (*e.g.*, Ryder System, Inc.) through Much is now in jeopardy, to the extent he seeks to speak authoritatively to them on behalf of Vantive. *Corp. Techs. v. Harnett*, 943 F. Supp. 2d 233, 240-43 (D. Mass. 2013), *aff'd* 731 F.3d 6 (1st Cir. 2013) (customer information, anticipated future needs constitute protectable confidential information).

**E. The Balance of Harms Tips Decidedly in Plaintiff's Favor**

Much acknowledged the protective covenants "do not impose an unreasonable burden upon me or the public." Agreement § 5. *See Aspect Software,* 787 F. Supp. 2d at 131 (noting contractual clause). Even absent the acknowledgement, "the consequence of every covenant not to compete … is that the covenantor is deprived of a possible means of earning his living, within a defined area and for a limited time. That fact alone does not make such covenants unenforceable." *Marine Contractors v. Hurley*, 365 Mass. 280, 298, 310 N.E.2d 915, 921 (1974). Much is able to work in other industries, including those he worked in before joining Plaintiff.

Much knew when he signed the Agreement and accepted all the benefits conferred that he would be precluded from working for a competitor for twelve (12) months. *DraftKings,* 732 F.

Supp. 3d at 120-121 (hardship to employee was predictable given the noncompetition agreement signed acknowledged that the harm would be irreparable and, in any event, it was outweighed by potential harm in disclosure of confidential information); *Cynosure*, 2022 WL 18033055 at *15 (balance of hardship favored employer). "What is also clear from the record is that [Much] is an experienced professional in a highly competitive market, who chose to assume both the risks and the benefits of the [Agreements], and has now, a mere [four years] later, chosen to assume the risk of violating [them]." *EMC Corp. v. Breen*, No. 12–04477-BLS2, 2013 WL 1907460, *4–5 (Mass. Super. Feb. 25, 2013). "[S]uch a calculated risk as that taken here by [Much] cannot be rewarded by allowing demonstrably unfair competition to continue unabated." *Id*. Vantive should not "have the benefit of [Much's] employment in contravention of his Agreement while the case pends for trial." *Life Image, Inc.*, 2011 WL 7443924 at *9.

### F. The Public Interest Favors Injunctive Relief

The public interest is served by granting injunctive relief because "[i]t is in society's best interest to recognize and enforce agreements which were voluntarily entered into and accepted. Allowing an individual to disregard such a promise would result in behavior which should not be condoned or encouraged." *New England Circuit Sales v. Randall*, Civ. A. No. 1:96-CV-10840, 1996 WL 1171929, *3 (D. Mass. June 4, 1996); *see also, Cynosure*, 2022 WL 18033055 at *16; *DraftKings,* 732 F. Supp. 3d at 121. Injunctive relief would serve only to require that Much honor the Agreements into which he willingly entered.

## IV. <u>CONCLUSION</u>

For the reasons set forth above, the Court should grant Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction.

Respectfully submitted,

FRESENIUS USA MANUFACTURING, INC.

By its attorneys,

***/s/ Jeffrey S. Siegel***

Jeffrey S. Siegel (BBO# 647148)
Sean P. O'Connor (BBO# 673835)
Robert Papandrea (BBO# 711504)
MORGAN, BROWN & JOY, LLP
28 State Street, 16th Floor
Boston, MA 02109
(617) 523-6666
(617) 367-3125 (fax)
jsiegel@morganbrown.com
soconnor@morganbrown.com
rpapandrea@morganbrown.com

Dated: August 5, 2026