**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| FRESENIUS USA MANUFACTURING, INC.,<br><br>Plaintiff,<br><br>-vs.-<br><br>MICAH MUCH,<br><br>Defendant. | Case No. 1:26-cv-13572 |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


Page

**I. INTRODUCTION .......... 1**

**II. FACTUAL BACKGROUND .......... 3**

**A. Much's Responsibilities at Fresenius Manufacturing .......... 3**

**B. Much Told Fresenius Manufacturing—Two Months Before He Resigned—That He Was Exploring an Opportunity at Vantive .......... 5**

**C. Much Accepted a Position at Vantive Only After Fresenius Manufacturing Reneged on Its Offer To Promote Him .......... 6**

**D. Much and Vantive Implemented Safeguards To Ensure That Much Does Not Disclose Fresenius's Confidential Information .......... 7**

**III. ARGUMENT .......... 8**

**A. Standard of Review** .......... 8

**B. Fresenius Manufacturing Is Not Likely To Succeed on the Merits** .......... 9

1. Much's Covenant Is Unenforceable as a Matter of Law .......... 9

2. Plaintiff's Request To Bar Much From Work for Vantive Anywhere in the World in Any Capacity Is Improper .......... 12

3. Plaintiff Is Not Likely To Succeed on Its Trade Secret Claims .......... 17

**C. Plaintiff Cannot Show That It Will Suffer Irreparable Harm** .......... 19

**D. The Balance of Harms & Public Interest Weigh Against Injunctive Relief** .......... 20

**IV. CONCLUSION .......... 20**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABM Indus. Grps. v. Palmarozzo*,
2017 WL 2292744 (Mass. Sup. Ct. Mar. 30, 2017) ........ 20

*Acoustic Processing Tech., Inc. v. KDH Elec. Sys. Inc.*,
697 F. Supp. 2d 146 (D. Me. 2010) ........ 19

*Anaplan Parent, LP v. Brennan*,
No. 2584CV02350 (Mass. Super. Ct. Sept. 15, 2025) ........ 11, 12

*Athenahealth, Inc. v. Cady*,
2013 WL 4008198 (Mass. Super. Ct. May 2, 2013) ........ 13

*Bel. Ins. Inc. v. Pilot Risk Mgmt. Consulting, LLC*
2022 NCBC LEXIS 49 (N.C. Super. Ct. May 25, 2022) ........ 11

*Campbell Soup Co. v. Giles*,
47 F.3d 467 (1st Cir. 1995) ........ 8

*Channing Bete Co., Inc. v. Greenberg*,
2021 WL 4691597 (D. Mass. July 12, 2021) ........ 2, 20

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
370 F.3d 151 (1st Cir. 2004) ........ 19

*Corp. Techs., Inc. v. Harnett*,
731 F.3d 6 (1st Cir. 2013) ........ 18

*Danieli & O'Keefe Assocs. v. Braverman*,
1994 WL 879855 (Mass. Sup. Ct. Jan. 20, 1994) ........ 15, 17

*Díaz-Báez v. Alicea-Vasallo*,
22 F.4th 11 (1st Cir. 2021) ........ 12

*Digital Realty Trust, Inc. v. Sprygada*,
2022 WL 2398394 (N.C. Super. Ct. July 1, 2022) ........ 11

*Dynamics Research Corp. v. Analytic Scis. Corp.*,
9 Mass. App. Ct. 254 (1980) ........ 15, 20

*EchoMail, Inc. v. Am. Express Co.*,
378 F. Supp. 2d 1 (D. Mass. 2005) ........ 8

*Exeter Grp. v. Sivan*,
2005 WL 1477735 (Mass. Sup. Ct. Mar. 24, 2005)....................20

*Fishman Transducers, Inc. v. Paul*,
684 F.3d 187 (1st Cir. 2012)....................2, 18

*Flatiron Health, Inc. v. Carson*,
2020 WL 1320867 (S.D.N.Y. Mar. 20, 2020)....................12

*Fortiline, Inc. v. McCall*,
2024 WL 4088629 (Del. Ch. Sept. 5, 2024)....................11

*Hassler v. Circle C Res.*,
505 P.3d 169 (Wyo. 2022)....................12

*Hub Grp., Inc. v. Knoll*,
2024 WL 345863 (Del. Ch. July 18, 2024)....................12

*Hyannis Port Rsch., Inc. v. Gonzales*,
2022 WL 17999498 (Mass. Super. Ct. Dec. 23, 2022)....................2, 13

*Idexxx Labs., Inc. v. Bilbrough*,
No. 2:22-cv-00056, 2022 WL 3042966 (D. Me. Aug. 2, 2022)....................18

*Kodiak Building Partners, LLC v. Adams*,
2022 WL 5240507 (Del. Ch. Oct. 6, 2022)....................11

*Lanmark Tech., Inc. v. Canales*,
454 F. Supp. 2d 524 (E.D. Va. 2006)....................12

*Largess v. Supreme Jud. Ct. for Mass.*,
317 F. Supp. 2d 77 (D. Mass. 2004)....................8

*Med. Staffing Network, Inc. v. Ridgeway*,
670 S.E.2d 321 (N.C. App. Ct. 2009)....................11

*Nat'l Med. Care, Inc. v. Sharif*,
No. CV 20-11460-MBB, 2020 WL 6318922 (D. Mass. Sept. 2, 2020)....................16

*Ortman v. Bio-Med. Applications of Pa., Inc.*,
Case No. 1:24-cv-11599 (D. Mass. Aug. 15, 2024)....................12

*Outdoor Lighting Perspectives Franchising, Inc. v. Harders*,
747 S.E.2d 256 (N.C. App. Ct. 2013)....................11

*Parexel International, LLC v. Signant Health Holding Corp. LLC*,
2023 WL 2938073 (D. Mass. Apr., 2023)....................19

*Planned Parenthood League of Mass. v. Bellotti*,
641 F.2d 1006 (1st Cir. 1981) ........ 8

*Spring Investor Servs., Inc. v. Carrington Capital Mgmt., LLC*,
2013 WL 1703890 (D. Mass. Apr. 18, 2013) ........ 18

*TargetSmart Holdings, LLC v. GHP Advisors, LLC*,
366 F. Supp. 3d 195 (2019) ........ 18

**Statutes**

18 U.S.C. § 1836(b)(3)(A)(i) ........ 18

G.L. c. 149 § 24L(b) ........ *passim*

**Other Authorities**

*Fresenius Mgmt. Servs., Inc. v. Carver*,
Case No. 1:26-cv-11901 (D. Mass. May 4, 2026), ECF No. 1-3 ........ 10

*Laughlin v. Fresenius Med. Care Holdings, Inc.*,
Case No. 2:23-cv-00180 (E.D. Wash. Aug. 24, 2023), ECF No. 16 ........ 12

# I. INTRODUCTION

Plaintiff Fresenius USA Manufacturing, Inc. ("Fresenius Manufacturing") hired Micah Much ("Much") in 2022. He worked most recently as Vice President of Supply Chain, Americas, and was responsible solely for demand planning and logistics within that region. His role was many layers below the CEO. When he was first hired, Much had 30 years of supply chain experience in the aerospace industry, and Fresenius Manufacturing hired Much specifically to bring that expertise to their company. For four years, Much applied that expertise, using well-known supply chain principles to help Fresenius Manufacturing.

On May 21, 2026, Much disclosed to his division manager that he was unhappy that Fresenius Manufacturing had delayed a promised promotion and had therefore decided to begin interviewing with other companies, including Vantive US Healthcare, LLC ("Vantive"). On August 5, 2026—more than two months after Much disclosed that he was interviewing at Vantive and three weeks after he formally resigned—Fresenius Manufacturing filed the instant Motion seeking to bar Much from working for Vantive in any capacity, anywhere in the world. Plaintiff's Motion impermissibly seeks to deprive Much of his right to use his general know-how to earn a living and must be denied for at least the following four reasons:

***First***, Much's noncompetition agreement is invalid under the Massachusetts Noncompetition Agreement Act ("MNAA") because it was executed by an executive from a parent/affiliate of his employer and restricts him from competing against every single affiliate of Fresenius Manufacturing. G.L. c. 149 § 24L(b) (requiring a noncompete agreement be signed by the employee and the "employer" and limiting protection to the "***employer's*** trades secrets. . . confidential information . . . or goodwill").

***Second***, Plaintiff's proposed order goes beyond what their own agreement permits and is expressly prohibited by the MNAA. Much's non-compete only prohibits him from working for a

competitor in "the same or substantially similar" role that he held for Fresenius Manufacturing and only in the geographic areas where he had a material influence. (ECF No. 1-4, 2025 PCA § 5(a)(v) & (b)). Further, the MNAA provides that a noncompete must be "no broader than necessary to protect . . . the employer's trade secrets . . . confidential information . . . [or] goodwill." G.L. c. 149 § 24L(b). To satisfy this standard, Plaintiff must show that, at Vantive, Much "is in a position 'where he can harm' the company by use of its trade secrets or confidential information," and that his confidentiality or non-solicitation provisions do not adequately address those concerns. *Hyannis Port Rsch., Inc. v. Gonzales*, 2022 WL 17999498, at *4 (Mass. Super. Ct. Dec. 23, 2022).

But Much's role at Vantive is not "substantially similar" to his prior role at Fresenius Manufacturing. At Fresenius Manufacturing, Much had regional responsibility for day-to-day demand planning and logistics. At Vantive, Much has global responsibility for several functions for which he had no responsibility at Fresenius Manufacturing including manufacturing and procurement. His responsibility for demand planning and logistics is minimal. Plaintiff has not shown why it is not sufficiently protected by the less restrictive confidentiality obligations in Much's restrictive covenant.

***Third***, Plaintiff's trade-secret theories fail as a matter of law. The Defend Trade Secrets Act ("DTSA") prohibits injunctions that prevent employees from working for a competitor and further does not afford relief absent evidence of misappropriation. The Massachusetts Trade Secret Act ("MTSA") does not apply: Much is a Texas resident and Vantive is headquartered in Illinois. *See Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 197 (1st Cir. 2012) (finding Massachusetts unfair competition act does not apply to individuals acting outside the state).

***Finally***, Plaintiff cannot establish irreparable harm. *See Channing Bete Co., Inc. v. Greenberg*, 2021 WL 4691597, at *7 (D. Mass. July 12, 2021) (delay in seeking injunctive relief

"substantially undermines" need for immediate relief). The Court should deny the Motion.

## II. FACTUAL BACKGROUND

### A. <u>Much's Responsibilities at Fresenius Manufacturing</u>

Fresenius Manufacturing is an indirect subsidiary of Fresenius Medical Care Holdings, Inc. ("Holdings"), which is in turn a subsidiary of its parent, Fresenius Medical Care AG ("Medical AG") (ECF No. 2) (collectively referred to as "Fresenius"). Medical AG is a conglomerate of legal entities, which collectively operate under the generic name, Fresenius Medical Care ("FME").

Much joined Fresenius Manufacturing in 2022, after more than 30 years in supply chain in the aerospace and defense industry, and most recently served as Vice President of Supply Chain, Americas. (Much Decl. ¶¶ 1-2). Before joining Fresenius Manufacturing, he served as the Executive Director of Supply Chain for the Mission Systems Business Unit at Collins Aerospace, overseeing $2 billion in procurement spending and global supply chain logistics. (*Id.* ¶ 2). More than 1,000 employees from multiple countries reported to him. (*Id.*). The aerospace and defense industry employs supply-chain systems, methodologies, and practices more advanced than those commonly used in the healthcare industry. (*Id.* ¶ 3). Thus, Much accumulated nearly three decades of experience in one of the world's most complex supply-chain organizations before entering the healthcare industry.

The term "supply chain" can mean different things at different companies. Broadly speaking, a supply chain can encompass the entire cycle from: (1) procuring materials needed to make goods; (2) manufacturing those goods; and (3) demand planning and logistics, which entails moving goods from the manufacturing facility to the customer, including inventory management (*e.g.*, managing warehouses and inventory storage) and transportation. (*Id.* ¶¶ 5-15). In some organizations, these functions report to a single supply chain executive; in others, the functions are divided among multiple departments and leaders with different responsibilities. (*Id.*).

At Fresenius Manufacturing, Much oversaw demand planning and logistics—the third and final supply chain function—solely in the Americas. (*Id.* ¶¶ 26-37). He was not responsible for these functions in other regions, nor was he responsible for procurement or manufacturing functions anywhere in the world. (*Id.* ¶¶ 38-39). He reported to Brett Beck ("Beck"), Global Senior Vice President of Supply Chain, operating four organizational layers below the CEO. (*Id.* ¶ 24).

Each month, Fresenius's commercial team (which did not report to Much) sent Much's team aggregated demand forecasts concerning anticipated product needs in the Americas. (*Id.* ¶ 35). His team used that information to determine what distribution networks and transportation lanes (which are numerous) would be used to ensure products reached customers in the Americas efficiently and on time. (*Id.*). These aggregated demand forecasts were updated every month and quickly became outdated. (*Id.* ¶ 36). Much had no insight into customer-specific demand or customer-level pricing. (*Id.* ¶ 37).

One of Much's principal duties at Fresenius Manufacturing was developing and executing an outsourcing strategy to third-party logistics providers ("3PLs"). (*Id.* ¶¶ 30-34). Fresenius Manufacturing initially hired him for his experience leading similar outsourcing initiatives. (*Id.*). Much's efforts culminated in Fresenius Manufacturing outsourcing its U.S. distribution centers and "last mile" transportation (*i.e.*, final delivery to customers) to 3PLs. (*Id.*).

During his tenure at Fresenius Manufacturing, Much participated in routine cross-functional meetings. (*Id.* ¶¶ 49-51). Those meetings generally consisted of updates against established goals and initiatives, were retrospective in nature, and involved topics not unique to FME or that were widely publicized. (*Id.*). Much's role in these meetings was "generally to present updates concerning the supply chain activities for which [he] was responsible," and "[a]fter delivering [his] portion of the presentation, [he] was often excused." (*Id.* ¶ 50).

The supply-chain principles and practices Much employed at Fresenius Manufacturing are generally known in the supply-chain profession, taught in industrial engineering programs across the United States, employed across multiple industries, and the product of Much's nearly three decades of experience. (*Id.* ¶¶ 4-15). Much's value lies in how he applies them to the unique characteristics of the company for which he works. (*Id.* ¶ 15).

### B. **Much Told Fresenius Manufacturing—Two Months Before He Resigned—That He Was Exploring an Opportunity at Vantive**

Much's direct superior, Beck, told Much during the week of February 23, 2026, that Fresenius Manufacturing was considering promoting Much to Global Senior Vice President of Supply Chain. (*Id.* ¶¶ 53-54). On April 27, 2026, Luigi Sorrentino, Executive Vice President of Manufacturing and Supply Chain, told Much that Fresenius Manufacturing intended to move forward with the promotion, and that he wanted to announce the promotion on June 1, 2026, with an anticipated effective date of July 1, 2026. (*Id.* ¶ 55). Nearly a month later, on May 20, 2026, Sorrentino presented Much with a verbal offer for the proposed position, including compensation terms. (*Id.* ¶ 57). Much thought the offer did not appropriately reflect the scope of the role or prevailing market compensation rates. (*Id.*). Much never received a written offer. (*Id.* ¶ 55).

On May 19, 21, and 22, 2026, Much met with Joe Turk, the President of Care Enablement, and expressed his frustration with the prolonged uncertainty regarding the possible promotion and the proposed compensation. (*Id.* ¶ 58). During those discussions, ***Much explicitly told Turk that he was exploring an opportunity with Vantive***. (*Id.* ¶ 59). Turk asked Much to discontinue his discussions with other companies to allow Turk an opportunity to resolve internal issues relating to Much's promotion. (*Id.*). Turk also suggested that Much counter the compensation terms. (*Id.* ¶ 60). On May 22, 2026, Much submitted a counterproposal. (*Id.*). Much did not commit to discontinuing his job search efforts, as Turk had asked. (*Id.* ¶ 59). Yet, he continued dutifully

performing his responsibilities to Fresenius Manufacturing while awaiting a response to his counterproposal, including participating in several routine meetings about which Fresenius Manufacturing now complains. (*Id.* ¶ 61). Neither Turk nor anyone else told Much not to attend the meetings or (to Much's knowledge) restricted his access to any information. (*Id.*).

Several weeks later, Fresenius Manufacturing rejected Much's counterproposal. (*Id.* ¶ 62). Then, Turk told Much that Fresenius Manufacturing would not be promoting him into the Global Senior Vice President of Supply Chain role at all, reneging on the company's earlier offer. (*Id.*). Much felt this was a reversal of Turk's position from a few weeks earlier, when Turk said that he would work to resolve issues relating to the potential promotion. (*Id.*).

### C. <u>Much Accepted a Position at Vantive Only After Fresenius Manufacturing Reneged on Its Offer To Promote Him</u>

Consistent with the discussions he had disclosed to Turk, Much continued exploring an opportunity at Vantive. (*Id.* ¶ 61). On July 14, 2026, Much received a written offer. (*Id.* ¶ 63). Much accepted Vantive's offer on July 16, 2026 and, within approximately one hour of doing so, told Fresenius Manufacturing he was resigning and joining Vantive. (*Id.* ¶ 64). Much also offered to assist with transition activities. (*Id.*). Fresenius Manufacturing declined Much's offer of transition support, and within one hour of receiving Much's resignation, relieved Much of his duties and disabled his access to company systems. (*Id.* ¶ 65). The following week, Much had limited interaction with Fresenius Manufacturing personnel, who failed to provide direction on what he should be doing. (*Id.* ¶ 66). So, on July 24, 2026, Much notified Fresenius Manufacturing that, because they appeared not to need his assistance with the transition, he planned to accelerate his departure date. (*Id.* ¶ 66 & Ex. A). Plaintiff did not respond. (*Id.*).

Much's employment with Vantive began on July 28, 2026. (*Id.* ¶ 72). He is a C-suite executive responsible for global strategic direction of Vantive's entire supply-chain organization,

including global procurement, manufacturing, and logistics. (*Id.* ¶ 73; Prutow Decl. ¶ 11). He oversees over 13,000 employees, most of whom work in Vantive's manufacturing facilities, and he reports directly to Vantive's CEO. (Much Decl. ¶ 74; Prutow Decl. ¶¶ 11-13). Although Much has oversight for global logistics strategy, he is not responsible for day-to-day demand planning and logistics activities within the Americas as he was at Fresenius Manufacturing (Much Decl. ¶¶ 75-77; Prutow Decl. ¶¶ 14-16). Those functions are managed by regional organizations that do not report to Much. (Much Decl. ¶¶ 75-77; Prutow Decl. ¶¶ 14-16).

### D. Much and Vantive Implemented Safeguards To Ensure That Much Does Not Disclose Fresenius's Confidential Information

Much (and Vantive) took steps before Much's employment began to ensure that Much would not disclose, or be perceived as being able to disclose, Fresenius's confidential, proprietary, or trade-secret information. For example, Much's offer letter (which Much signed) acknowledged that Much executed a July 28, 2025, Employee Confidentiality, Assignment, and Protective Covenants Agreement ("PCA") with "a subsidiary of Fresenius Medical Care Holdings, Inc." (Much Decl., Ex. C).[1] The PCA requires Much to protect Fresenius's confidential information and trade secrets and purports to contain a 12-month non-compete. (ECF No. 1-4, §§ 5(b), 7). Vantive made Much promise to comply with his obligations in that agreement, including returning company property, protecting FME confidential information, and refraining from using or disclosing such information to Vantive. (Much Decl. ¶ 71 & Ex. C). Much did so. (*Id.*).

Much also undertook significant preservation and remediation efforts to ensure that no potentially sensitive FME information was in his possession before his first day at Vantive. (*Id.*

[1] Much also signed PCAs on November 28, 2022, August 1, 2023, and July 25, 2024. (ECF No. 5 at 1). The 2025 PCA "is intended to be in addition to (and not replace) any other agreement(s) [Much] has entered into which address(es) post-employment obligations." (ECF No. 1-4 § 10). The provisions at issue in this case are substantially identical across the four agreements. For brevity, Much only discusses the 2025 PCA.

Decl. ¶¶ 67-71). He identified a limited amount of Fresenius Manufacturing information residing in certain personal accounts and devices and proactively asked Plaintiff how it wanted that information to be handled. (*Id.*). When Plaintiff did not respond, Much retained Charles River Associates ("CRA") to image and collect data from all potentially relevant sources and removed all potentially sensitive company information from those sources before starting his employment with Vantive. (*Id.* ¶ 70). Only CRA has access to the images. (*Id.*; Roffman Decl. ¶ 10).

## III. ARGUMENT

### A. Standard of Review

Plaintiff has simultaneously requested a temporary restraining order and preliminary injunction. The standard is the same for both. *Largess v. Supreme Jud. Ct. for Mass.*, 317 F. Supp. 2d 77, 81 (D. Mass. 2004). To obtain interim injunctive relief, a movant must show: "(1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction." *Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981) (quotations omitted). If a plaintiff "fail[s] to demonstrate at least one of the four elements required for a preliminary injunction to issue, its motion for injunctive relief will be denied." *EchoMail, Inc. v. Am. Express Co.*, 378 F. Supp. 2d 1, 2 (D. Mass. 2005).

A court must be particularly hesitant to grant extraordinary injunctive relief based solely on competing declarations; indeed, a court's discretion is at its narrowest where "the parties' competing versions of the pertinent factual events are in sharp dispute, such that the propriety of injunctive relief hinges on determinations of credibility." *Campbell Soup Co. v. Giles*, 47 F.3d 467, 470 (1st Cir. 1995). In those circumstances, "the inappropriateness of proceeding on affidavits [alone] attains its maximum." *Id.*

### B. <u>Fresenius Manufacturing Is Not Likely To Succeed on the Merits</u>

#### 1. Much's Covenant Is Unenforceable as a Matter of Law

The Court initially must address a gating issue on the enforceability of the operative covenants. The PCA runs afoul of the MNAA because the restrictive covenants: (1) are not signed by Much's actual employer; and (2) go beyond Plaintiff's legitimate interests by including every related entity in the FME conglomerate.

Under the MNAA, a noncompete agreement is enforceable only if it "meet[s] the minimum requirements of paragraphs (i) through (viii)," which provides in relevant part:

> (i) & (ii) . . . the agreement must be in writing and signed by both the **employer** and employee . . . .
>
> (iii) The agreement must be no broader than necessary to protect one or more of the following legitimate business interests of **the employer**: (A) the **employer's** trade secrets; (B) the **employer's** confidential information . . . or (C) the **employer's** goodwill. . . .

G.L. c. 149 § 24L(b).

***First***, according to Paragraphs 12 and 53 of the Complaint, Much's "Employer" is Fresenius Manufacturing. But that entity is not identified in the PCA. Instead, the PCA states only that it is between Much and an unnamed "subsidiary of Fresenius Medical Care Holdings, Inc." (ECF No. 1-4 at 1). The confidentiality provisions in Section 3 and the protective covenants in Section 5 also extend well beyond Much's employer to the "Company," which is defined to include his "Employer and its related/affiliated companies."[2] (*Id.* § 1). Specifically:

- Section 3 defines confidential information as "information or a compilation of information in any form . . . belonging to ***the Company***." (emphasis added). (*Id.* § 3).
- Section 5(b) precludes Much from working in a substantially similar role for a Competing Business, which is further defined in Section 5(a)(1) to include any person or entity that

[2] Affiliate is a term of art defined by SEC rules and includes parent, subsidiaries, and sister companies or any entity that is under common control with another. (Securities Act Rule 405 and Exchange Act Rule 12b-2).

competes "with any business that ***the Company*** conducts." (*Id.* § 5(a)(i)).

- Section 6 states the "employee agree[s] that each of the Employer's related/affiliated entities is a third-party beneficiary to this Agreement . . . ." (*Id.* § 6).

Plaintiff's Rule 7.1(a) disclosures state that Fresenius Manufacturing is a "subsidiary of its ***ultimate*** parent company Fresenius Medica[l] Care AG." (ECF No. 2 at 1 (emphasis added)). Public filings confirm that Medical AG operates through an extensive network of subsidiaries worldwide and that Holdings is a holding company for its North American operations. According to public filings, Medical AG is related to more than ***1,450*** legal entities around world operating in many different business lines. (*See* McConnell Decl., Ex. A).

***Second***, Much's covenants are signed by a person who reports his title but not the entity he works for:

1. 2022 PCA – Brian Silva (Title: Head, Global Human Resources)
2. 2023 PCA – Brian Silva (Title: Head, Global Human Resources)
3. 2024 PCA – Brian Silva (Title: Head, Global Human Resources)
4. 2025 PCA – Michael Dunleavy, Jr. (Title: SVP, Global Total Rewards).

Silva's and Dunleavy's LinkedIn profiles indicate they work somewhere in the FME conglomerate but not likely for Much's employer, Fresenius Manufacturing.[3] In fact, earlier this year, Fresenius Management Services, another entity in the conglomerate, sued a former employee for breaching her restrictive covenant. *See Fresenius Mgmt. Servs., Inc. v. Carver,* Case No. 1:26-cv-11901 (D. Mass. May 4, 2026) (ECF No. 1-3). In those pleadings, plaintiff attached the former employee's restrictive covenant which she executed in 2020 and which is nearly identical to Much's covenant; Silva signed that covenant too, purportedly on behalf of Fresenius Management Services. *Id.*

The MNAA requires that a noncompetition agreement be "signed by both the employer

[3] Dunleavy's LinkedIn page states he is the Senior Vice President Human Resources, Global Total Rewards for FME—a 120,000-employee entity covering 150 countries. *See* https://www.linkedin.com/in/mike-dunleavy-jr-global-hr. Silva's LinkedIn page states that from 2009 through January 2025, he was the Global Chief Human Resources Office and Senior Vice President of FME, managing 1,100 Human Resources Professionals. *See* https://www.linkedin.com/in/brian-silva-shrm-scp-888b1a14.

and employee." G.L. c. 149 § 24L(b). This is not a waivable violation:

> The signature requirement plainly seeks to ensure that there is concrete evidence that the employer and employee entered into a binding non-compete agreement and thereby assumed the reciprocal obligations under the statute. Including a parent corporation (or grand, great, etc.) would seemingly frustrate the purposes of the statute as it could . . . allow the "employer" to invoke the much broader business interests of parents, subsidiaries, and/or affiliates to enforce more onerous restrictions on the ex-employee. Those should not be read into the statute.

*Anaplan Parent, LP v. Brennan ("Anaplan")*, No. 2584CV02350 (Mass. Super. Ct. Sept. 15, 2025) (invalidating restrictive covenant in equity grant because signatory and party to the covenant was the parent company of employer rather than entity that actually employed defendant-employee).[4]

The statute's limitation on protecting only the *employer's* confidential information and goodwill also serves an important notice and fairness purpose which is absent here. Much (and any other employee subject to this form covenant) has no way of knowing the scope of his restrictions. The failure to provide employees with this basic notice violates the plain language of the MNAA and is consistent with an emerging trend among courts interpreting common law that consistently reject efforts to extend covenants to unnamed and undisclosed affiliates as patently unfair. *E.g.*, *Fortiline, Inc. v. McCall*, 2024 WL 4088629, at *4 (Del. Ch. Sept. 5, 2024)*; Kodiak Building Partners, LLC v. Adams*, 2022 WL 5240507, at *11 (Del. Ch. Oct. 6, 2022).[5]

Furthermore, unlike in *Anaplan*, where the plaintiff insisted the parent company was also the employer, Holdings has insisted in other litigation that its corporate affiliates are legally distinct and that parent companies are not joint employers of subsidiary employees:

- "[Holdings] has no employees and Plaintiff fails to allege plausible facts supporting her conclusion that [Holdings] and RCG are joint employers." *Laughlin v. Fresenius Med. Care*

[4] The trial court's decision in *Anaplan* was appealed and, while that appeal was pending, transferred to the Supreme Judicial Court *sua sponte*. It is scheduled for oral argument on September 9, 2026 under Dkt. No. SJC-13917.

[5] *See also Digital Realty Trust, Inc. v. Sprygada*, 2022 WL 2398394, at *14 (N.C. Super. Ct. July 1, 2022); *Bel. Ins. Inc. v. Pilot Risk Mgmt. Consulting, LLC*, 2022 NCBC LEXIS 49, at *35 (N.C. Super. Ct. May 25, 2022); *Medical Staffing Network, Inc. v. Ridgeway*, 670 S.E.2d 321, 328 (N.C. App. Ct. 2009); *Outdoor Lighting Perspectives Franchising, Inc. v. Harders*, 747 S.E.2d 256, 265 (N.C. App. Ct. 2013).

*Holdings, Inc.*, Case No. 2:23-cv-00180 (E.D. Wash. Aug. 24, 2023) (ECF No. 16).

- "Plaintiff pleads no facts to suggest [Holdings] was his employer under Pennsylvania law; he instead asks this Court to speculate that [Holdings] may be liable based on an alleged, indirect parent-subsidiary relationship with BMA." *Ortman v. Bio-Med. Applications of Pa., Inc.*, Case No. 1:24-cv-11599 (D. Mass. Aug. 15, 2024) (ECF No. 21 at 1).

Holdings is now estopped from claiming that it or any of its other affiliates jointly employed Much. *See Díaz-Báez v. Alicea-Vasallo*, 22 F.4th 11, 21-22 (1st Cir. 2021) (judicially estopping litigants from reversing prior position after persuading another court to accept that prior position).[6]

Here, as in *Anaplan*, the PCA is not signed by the employer and is therefore unenforceable.

**2. Plaintiff's Request To Bar Much From Work for Vantive Anywhere in the World in Any Capacity Is Improper**

Plaintiff's proposed order seeking to bar Much from working for Vantive worldwide in any role is a wild overreach that goes beyond what their own agreement permits and is expressly prohibited by the MNAA. Much's non-compete only applies if he accepts a position with "duties, services, and/or responsibilities [that] are the same as or substantially similar to . . . duties and responsibilities [he] performed for" Plaintiff in the two years preceding termination. (ECF No. 1-4 § 5(b)). Much is also precluded from working for a competitor only in the geographic areas where he had a material presence or influence. (*Id*. at § 5(a)(v)).

The MNAA further provides that a noncompete must be "no broader than necessary to protect . . . the employer's trade secrets[,] . . .confidential information . . . or . . . goodwill." G.L. c. 149 § 24L(b). To satisfy this standard, Plaintiff must show that, at Vantive, Much "is in a position 'where he can harm' the company by use of its trade secrets or confidential information" and that

[6] The Court should not entertain any request by Plaintiff to blue pencil the covenant. Although the MNAA grants a court *discretion* to reform a covenant, courts around the country have recognized that reforming covenants for employers who make no effort to draft the legal limit "encourage[s] the use of overbroad non-competes" for the *ad terrorem*, effect even if unenforceable. *Hub Grp., Inc. v. Knoll*, 2024 WL 345863, at *12 (Del. Ch. July 18, 2024) (invalidating and refusing to blue pencil restrictive covenant that extended to affiliates); *Hassler v. Circle C Res.,* 505 P.3d 169, 177-78 (Wyo. 2022); *Flatiron Health, Inc. v. Carson*, 2020 WL 1320867, at *23 (S.D.N.Y. Mar. 20, 2020); *Lanmark Tech., Inc. v. Canales*, 454 F. Supp. 2d 524, 528-29 (E.D. Va. 2006).

his confidentiality or non-solicitation provisions will not adequately address those concerns. *Hyannis Port Rsch., Inc. v. Gonzales*, 2022 WL 17999498, at *4 (Mass. Super. Ct. Dec. 23, 2022).

Plaintiff cannot make that showing. Much's responsibilities at Vantive are materially different from his prior role at Fresenius Manufacturing. At Fresenius Manufacturing, Much oversaw approximately 450 employees working exclusively on logistics, and only in the Americas. Their principal responsibility was to ensure that inventory was positioned and delivered to meet demand in that region. (Much Decl. ¶¶ 26-27, 35). At Vantive, Much has global responsibility for procurement and manufacturing operations, functions for which he had ***zero*** responsibility at Fresenius. (Prutow Decl. ¶¶ 11-13). He oversees approximately 13,000 employees, most of whom work in Vantive's manufacturing plants. (*Id*.). There is no justification for enjoining Much in any capacity from overseeing manufacturing operations or procurement.

Much will have some responsibility for logistics functions at Vantive, but not in a manner substantially similar to his former role at Fresenius. The Vantive employees who oversee day-to-day demand planning and logistics will not be reporting to him. Instead, those individuals will report directly to their regional commercial Presidents. Much's role will be driving continuity, strategy, and excellence across Vantive's supply chain functions including demand planning and logistics, but he will not dive into day-to-day implementation as he did at Fresenius. (Prutow Decl. ¶¶ 14-16). Such high-level strategy is precisely what he did not do and was not asked to do at Fresenius. (Much Decl. ¶¶ 26, 76-77); *see Athenahealth, Inc. v. Cady*, 2013 WL 4008198, at *4-8 (Mass. Super. Ct. May 2, 2013) (denying preliminary injunction where engineer's role at new company was materially different from prior role).

Even if Plaintiff had asked for more limited relief barring Much from working in demand planning and logistics in the Americas (*the extent of his PCA restriction*), Plaintiff cannot meet the

statutory requirement to show that such a restriction is necessary to protect their confidential information. Plaintiff's brief feigns as though it can meet this burden with conclusory allegations about Much's access to three categories of information belonging to ***<u>FME</u>*** generally: (1) past, current and future supply chain strategy; (2) "PD Turnaround Project"; and (3) interactions with customers, including DaVita. But Much has now submitted a 30-page declaration disputing every one of these allegations and explaining that Plaintiff has no secret supply chain strategy. Plaintiff's documents merely reflect publicly available information about initiatives common in business.

**(1) Supply Chain Strategy:** Plaintiff submitted declarations from Brent Melancon and Almasa Lauredant claiming Much led Plaintiff's supply chain strategy, which he would inevitably use or disclose to Vantive's benefit. Each attached a sealed exhibit to their declaration purporting to show examples of a trade-secret approach to supply chain.

[redacted]

[redacted]

Finally, Much's primary role at Fresenius Manufacturing was ensuring that inventory was positioned and delivered to the customer on time and in full. Any information that Much has about Fresenius Manufacturing's performance metrics on this front would not be helpful to Vantive—supply chain strategy is inherently tethered to the unique location of a company's factories, distribution centers, and customers, and FME was not doing anything unique. (*Id.* ¶¶ 15, 42, 48). Vantive hired Much for the same reason as did Fresenius Manufacturing—his decades of supply chain expertise and leadership capabilities. That is precisely what Much is permitted to take to Vantive. *See Danieli & O'Keefe Assocs. v. Braverman*, 1994 WL 879855, at *4 (Mass. Sup. Ct. Jan. 20, 1994) (employee was free to "achieve superiority in his particular department by every lawful means at hand, and then, upon the rightful termination of his contract for service, use that superiority for the benefit of rivals in trade of his former employer"); *Dynamics Research Corp. v. Analytic Scis. Corp.*, 9 Mass. App. Ct. 254, 267-69 (1980) (same).

[redacted]

[redacted]

This is also a red herring. Much has no role in product development at Vantive, and Plaintiff has put forth zero evidence that Much is untrustworthy such that his confidentiality agreement does not afford sufficient protection. Unlike the defendant in *National Medical Care, Inc. v. Sharif*, No. CV 20-11460-MBB, 2020 WL 6318922, at *7 (D. Mass. Sept. 2, 2020), cited by Plaintiff (ECF No. 5 at 16-17), there is no evidence that Much or Vantive has understated or misstated Much's responsibilities, and Much has been transparent about his recruitment and joining of Vantive and efforts to ensure he did not retain Plaintiff's confidential information. (Much Decl. ¶¶ 59-71).

**(3) Customer Information:** Plaintiff attached an email exchange between Much and representatives from DaVita to show that he was interacting with DaVita about how Plaintiff's supply chain performance sets them apart. (ECF Nos. 11-2 & 11-3). Statements by Much to DaVita regarding Plaintiff's ability to deliver products on time and in full are hardly a basis to preclude Much from working for Vantive. Such statements were nothing more than general descriptions of operational performance and are a far cry from evidence that Much occupied a customer-facing role. Indeed, Much had no sales or marketing responsibility at Fresenius Manufacturing. In any event, Plaintiff does not allege that Much has violated or is likely to violate his non-solicit.[7] Any interaction that Much had with DaVita or other customers has no relevance to this motion.

[7] The absence of any allegation of solicitation is another example of overreach in the proposed order, which would enjoin Much from soliciting Plaintiff's clients *sans* evidence of a violation.

**3. Plaintiff Is Not Likely To Succeed on Its Trade Secret Claims**

Under Rule 11, a lawyer who signs a pleading warrants that "the factual contentions have evidentiary support." Fed. R. Civ. P. 11(b)(3). There is not a single factual allegation to support the baseless accusations in Paragraphs 66, 68, 69, 80, 82, and 83 of the Complaint that Much has taken or used Plaintiff's trade secrets for Vantive's benefit. And Plaintiff knew these allegations were meritless before it came to Court. (ECF No. 8-3, Siegel Decl., Ex. C). After resigning, Much returned his work computer and iPad, and Plaintiff remotely wiped its applications and data from his personal phone. (Much Decl. ¶ 68). Much then emailed Plaintiff on July 20, 2026, alerting them that over his tenure he placed some Fresenius Manufacturing information in two cloud accounts and possibly his personal email. (*Id.* ¶ 69 & Ex. B). He asked for guidance on how to proceed and offered to join a Teams meeting with Plaintiff's IT team to guide him through secure deletion. (*Id.*). Plaintiff did not respond. (*Id.*). Much then retained CRA to image and preserve the accounts so there would be a record of any information that he may have in his possession. (*Id.* ¶ 70). Then CRA and Much searched for and deleted the Fresenius Manufacturing information in his possession before Much's start date at Vantive. (*Id.*; Roffman Decl. ¶¶ 5-9). Much went beyond what he was required to do and deserves far better than a false attack in a public pleading.

Beyond that, Plaintiff argues that this Court should enjoin Much from working for Vantive anywhere in the world in any role under the DTSA and MTSA based on an inevitable disclosure theory. (ECF No. 5 at 3). This request fails for three independent reasons.

**First:** Plaintiff has not sufficiently pleaded Much's access to actual trade secrets. Plaintiff speculates that Much "necessarily had access to . . . supply chain operations, logistics strategies, transportation strategies, future products and launches . . . and other company strategies." (ECF No. 5 at 2). This may be confidential business information, but that does not mean it "qualifies as [Plaintiff's] trade secret." *Braverman*, 1994 WL 879855, at *5 ("It is well known that in business

most matters are considered as confidential; however, only secrets affording a demonstrable competitive advantage may be properly considered as trade secrets." (quotations omitted)).

**Second:** The injunction Plaintiff seeks is prohibited by the DTSA because it is based on an unsupported inevitable disclosure theory.[8] The DTSA precludes the Court from issuing an order that "prevent[s] a person from entering into an employment relationship" and requires that any "conditions placed on such employment shall be based on evidence of threatened misappropriation and not merely on the information the person knows." 18 U.S.C. § 1836(b)(3)(A)(i); *see Idexxx Labs., Inc. v. Bilbrough*, No. 2:22-cv-00056, 2022 WL 3042966, *6 (D. Me. Aug. 2, 2022) (denying injunction and dismissing DTSA claim "based on the plain language of the statute.").

**Third:** The MTSA expressly "appl[ies] only to 'any course of conduct, pattern of activity, or activities [that] occur and have their competitive impact primarily and predominantly ***within [Massachusetts]***.'" *TargetSmart Holdings, LLC v. GHP Advisors, LLC*, 366 F. Supp. 3d 195, 212 n.2 (2019) (quoting G.L. c. 93 § 3) (emphasis added). Massachusetts courts focus on where the "allegedly unfair *conduct*. . . took place," not the location of the plaintiff's headquarters. *Spring Investor Servs., Inc. v. Carrington Capital Mgmt., LLC*, 2013 WL 1703890, at *12 (D. Mass. Apr. 18, 2013) (quotation omitted) (finding lack of evidence that Massachusetts was the "center of gravity" of misconduct). It is irrelevant that Fresenius Manufacturing is headquartered in Massachusetts. *See Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 197 (1st Cir. 2012) (fact that harm occurred in Massachusetts, where plaintiff was based, was insufficient for c. 93A to apply).

Much lived and worked in Texas while employed by Fresenius Manufacturing, and he now lives and works in Texas for Vantive. (Much Decl. ¶ 25). Any retention, disclosure, or use of Fresenius Manufacturing's purported trade secrets—which rest on conclusory allegations—would

---

[8] The inevitable disclosure doctrine is "sparingly used in Massachusetts." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 14 (1st Cir. 2013).

have occurred in Texas. Since Plaintiff has not shown that any misappropriation occurred "primarily and predominantly" within Massachusetts, the MTSA does not apply.

### C. Plaintiff Cannot Show That It Will Suffer Irreparable Harm

Fresenius Manufacturing claims Much has conceded this factor because he acknowledged in the PCAs that a breach of the agreements would cause "irreparable harm." (ECF No. 5 at 18). Plaintiff is wrong. Such contractual language is not dispositive proof of irreparable harm; at the injunction stage, proof must be based on actual evidence. *See Acoustic Processing Tech., Inc. v. KDH Elec. Sys. Inc.*, 697 F. Supp. 2d 146, 157-58 (D. Me. 2010) (citing cases).[9]

A "finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) (affirming denial of preliminary injunction). Plaintiff's meager concerns do not suffice.

> [C]oncerns about [Much] using proprietary [Fresenius] information are minimal, as [Vantive] warrants that it has not used any proprietary information of [Fresenius], has no use for [Fresenius] trade secrets and confidential information, because of its entirely different business model, products, and structure (and, to be clear, [Vantive] has made clear to [Much] that it does not intend for him to divulge any such confidential information).

*Parexel*, Case No. 1:22-cv-11896, ECF No. 33 at 9 (quoting counsel for Fresenius Manufacturing's brief in another matter where he was representing the defendant).

Fresenius Manufacturing had ample time and opportunity to address its supposed concerns but did not. It knew Much was exploring an opportunity with Vantive for nearly two months before he resigned and then waited another three weeks to bring this Motion. (Much Decl. ¶¶ 59, 64). Yet,

---

[9] Plaintiff's counsel acknowledged this in *Parexel International, LLC v. Signant Health Holding Corp.*, where they explained that "[i]rreparable harm cannot be assumed, even where a former employee possesses an employer's confidential information." No. 1:22-cv-11896 (D. Mass. Jan. 9, 2023), ECF No. 33 at 13 (citation omitted); *see Parexel Int'l,* LLC, 2023 WL 2938073 (D. Mass. Apr., 2023) (denying injunction).

it left him in the same role with the same access to information, continued involving him in meetings and ongoing business activities, and allowed him to perform his duties without restriction. (*Id.* ¶ 61). If Plaintiff genuinely believed that Much posed an imminent threat, it could have limited his access, accelerated his contemplated promotion, or relieved him of sensitive responsibilities. Having failed to do so with full knowledge that Much was considering opportunities at Vantive, Plaintiff cannot credibly claim that an emergency arose when Much accepted the opportunity he disclosed months earlier. *See Channing Bete Co., Inc.*, 2021 WL 4691597, at *7.

### D. The Balance of Harms & Public Interest Weigh Against Injunctive Relief

While Plaintiff has failed to show tangible harm, the harm to Much from an injunction would be severe and immediate because he would be out of a job. That loss of employment would create significant financial hardship for Much and his family because it would mean losing his family's only source of income. (Much Decl. ¶ 78); *see Exeter Grp. v. Sivan*, 2005 WL 1477735, at *6 (Mass. Sup. Ct. Mar. 24, 2005) (balance of harms favored employee where employer's asserted risk of trade-secret disclosure was unsupported, but injunction threatened employee's ability to work). The public benefits when a highly skilled employee like Much is permitted to "maximize[] the benefit of the national store of skill and knowledge" rather than be sidelined from his career. *Dynamics Research*, 9 Mass. App. Ct. at 267; *ABM Indus. Grps. v. Palmarozzo*, 2017 WL 2292744, at *2 (Mass. Sup. Ct. Mar. 30, 2017).

## IV. CONCLUSION

Based upon the foregoing facts, arguments and authorities, Defendant respectfully requests that the Court deny Plaintiff's Motion in its entirety.

Respectfully submitted,

**MICAH MUCH**,

By his attorneys,

*/s/ Steven J. Torres*
Steven J. Torres (BBO #648616)
Jonathan M. Shine (BBO #662183)
TORRES SCAMMON HINCKS & DAY
119 High Street
Boston, MA 02110
T: (617) 206-4895
E: storres@tshdlegal.com
E: jshine@tshdlegal.com

Rachel Cowen (admitted *pro hac vice*)
DECHERT LLP
444 W. Lake Street, Suite 2100
Chicago, IL60606
T: (312) 646-5825
E: rachel.cowen@dechert.com

Julie H. McConnell (admitted *pro hac vice*)
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
T: (202) 261-3329
E: julie.mcconnell@dechert.com

Joel Zemach
DECHERT LLP
777 Brickell Avenue, Suite 500
Miami, FL 33131
T: (215) 994-2328
E: joel.zemach@dechert.com

DATED: August 17, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on August 17, 2026, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system which will automatically send notification of such filing to all counsel of record who are registered to receive electronic notification.

*/s/ Jonathan M. Shine*
Jonathan M. Shine