**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| FRESENIUS USA MANUFACTURING, INC.<br><br>Plaintiff,<br><br>v.<br><br>MICAH MUCH,<br><br>Defendant. | CIVIL ACTION NO. 1:26-cv-13572 |

**PLAINTIFF'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

FRESENIUS USA MANUFACTURING, INC.

Jeffrey S. Siegel (BBO# 647148)
Sean P. O'Connor (BBO# 673835)
Robert Papandrea (BBO# 711504)
MORGAN, BROWN & JOY, LLP
28 State Street, 16th Floor
Boston, MA 02109
(617) 523-6666
(617) 367-3125 (fax)
jsiegel@morganbrown.com
soconnor@morganbrown.com
rpapandrea@morganbrown.com

Dated: August 20, 2026

## I. Introduction[1]

The Opposition goes to great lengths to distract from the core issues in this case, over which there is no real dispute. Ultimately, it is clear that Much entered into the Agreements through his employment with Plaintiff and that the Agreements' terms expressly prohibit him from working for Vantive in circumstances where his "duties, services, and/or responsibilities are the same as or substantially similar ***to any of*** the duties and responsibilities" he performed for Plaintiff. To that end, Much admits, or does not otherwise refute, that: (1) his role at Plaintiff was that of a senior executive with responsibilities for overseeing the strategic vision and operational excellence of FME's supply chain operations in the Americas; and (2) his role at Vantive is that of a senior executive with responsibilities that include overseeing the strategic direction of the company's entire logistics strategy in the Americas through which he will be responsible for "driving continuity, strategy, and excellence across … logistics." In short, there is no dispute Much's role at Vantive includes responsibilities nearly identical to those he had for Plaintiff.

There is similarly no dispute that Much had access to FME's confidential, proprietary and trade secret information as part of his responsibilities, including information that expanded into other areas of FME's business that were not his primary responsibilities. Indeed, Much routinely participated in meetings and discussions with high-level executives at the company about incredibly sensitive confidential information – and even continued doing so while planning to join Vantive despite being told that was prohibited by his noncompetition obligations. Much has not disputed, or even addressed, most of the evidence that Plaintiff has submitted on these issues.

[1] Consistent abbreviations are used throughout Plaintiff's filings. The facts are set forth in more detail in the Declarations of Jeffrey S. Siegel (Doc. 8), Heather Richins (Doc. 9), Brett Beck (Doc. 10), Brent Melancon (Doc. 11), Almasa Lauredant (Doc. 12), the Declaration of Patricia Rich ("Rich. Dec.") and the Declaration of Joseph Turk, Jr. ("Turk Dec."). The Declaration of Defendant Micah Much (Doc. 42) is cited "Much Dec." Defendant's Opposition to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. 41) is cited as ("Opp.").

The Opposition tries to avoid these critical issues by deflecting the focus in various ways. For example, it attempts to minimize Much's role at Plaintiff while claiming he will also have new responsibilities (in addition to those he also had at Plaintiff). It makes isolated arguments about only a few very specific pieces of information extracted from Plaintiff's evidence to suggest they are not confidential. It also raises several technical arguments to try and evade the Agreements' obligations entirely. As described below, these attempts are unavailing.

Behind the curtain of Much's arguments remains the truth: This case involves a senior-level executive (the former architect of FME's supply chain strategies for all of North and South America) who had valid noncompetition obligations and substantial access to key confidential information and trade secrets, and is now attempting to take another high-level executive role with a key direct competitor. This is precisely the scenario that noncompetition agreements are designed to protect against; the law does not require Plaintiff to wait until its confidential information is actually used before obtaining relief. Accordingly, the requested injunction is warranted.

## II. <u>Much's Employment with Vantive Directly Breaches Section 5(b) of the Agreements</u>

The Opposition repeatedly misrepresents the scope of the Agreements' restrictions, implying they only prohibit Much from working with Vantive if his role there, in its entirety, is the same or substantially similar to his role at Plaintiff. In truth, the Agreements unambiguously prohibit Much from working for Vantive where his "duties, services, and/or responsibilities are the same as or substantially similar ***to any of*** the duties and responsibilities" he performed for Plaintiff. *See* Agreements § 5(b) (emphasis added); *see also Agri-Mark, Inc. v. Niro, Inc.*, 233 F. Supp. 2d 200, 209 (D. Mass. 2002) (unambiguous contract language must be interpret "according to its plain terms."). Here, there is no dispute that many of the duties and responsibilities Much has at Vantive are the same or substantially similar (in fact, identical) to those he had at Plaintiff.

Much admits his role at Vantive is that of a senior executive with responsibilities that

include overseeing the strategic direction of the company's entire logistics strategy in the Americas. Opp. 6-7. He will be responsible for "driving continuity, strategy, and excellence across … logistics." *Id* at. 13. He had these same responsibilities in his role with Plaintiff, where he was the senior executive leader responsible for the strategic vision and operational excellence of FME's supply chain operations in the Americas. Beck Dec. ¶ 10; Richins Dec. ¶ 24. Much's suggestion that he is not responsible for certain "day-to-day" logistics functions at Vantive is an obvious attempt to disguise the fact that those were not his primary responsibilities at Plaintiff either. He was not a lower-level warehouse manager with Plaintiff, as he would like the Court to believe; he was a senior executive who, as he admits, "oversaw demand planning and logistics" throughout all of the Americas. Opp. 4. Again, he was the architect for FME's future supply chain strategies. This was a senior-executive level strategic role, not a "day-to-day" lower-level management role.

Much tries to distract from this unavoidable truth by suggesting his Vantive role differs because it has some additional responsibilities, including for procurement and manufacturing as well as global logistics responsibilities (where he had such responsibilities over the Americas at Plaintiff). This is irrelevant. Much's suggestions that he has a different reporting structure and will be overseeing additional employees at Vantive are similarly irrelevant. Nothing under the Agreements, or the MNAA, suggests Much can evade his restrictive covenant obligations by taking on a role for a direct competitor that includes some additional responsibilities or that may technically be at a higher-level. Indeed, the fact that he was a senior-level executive at Plaintiff with access to its highly confidential information and trade secrets – including those related to areas such as manufacturing, procurement and other areas of the company – actually underscores the need for the Agreements' enforcement to prevent him from taking such a high-level role with Vantive. Regardless, the undisputed fact remains that Much's responsibilities with Vantive still

include other responsibilities that "are the same as or substantially similar to any of the duties and responsibilities" he performed for Plaintiff. A broader or higher-level role would not obviate this.[2]

## III. There is No Dispute Much Had Access to FME's Confidential Information and Trade Secrets and Exploited His Access While Planning to Join Vantive

There is no dispute, and the Opposition concedes, Much had access to FME's confidential, proprietary and trade secret information as part of his responsibilities. Opp. 7, 16. At most, Much argues, "Plaintiff has not sufficiently pleaded Much's access to actual trade secrets" – which is incorrect. Understanding he cannot deny his access to highly sensitive information, Much tries to distract by pointing to random pieces of public information (mostly unrelated to Plaintiff's evidence) and making isolated arguments on aspects of certain slides.[3] Yet, he completely ignores all of the following evidence Plaintiff submitted that remains entirely uncontroverted: (i) Beck Dec., ¶¶ 6-31, Ex. A;[4] (ii) Lauredant Dec. ¶¶ 5-14, Exs. A, C;[5] and (iii) Melancon Dec., ¶¶ 6-8, 18-24, Exs. A, C, D, E.[6] Thus, there is no dispute that Much was privy to some of the company's most sensitive confidential information, including for areas beyond his own personal responsibilities.

The Opposition also appears to confuse Plaintiff's evidence on the PD Turnaround Project with other meetings that Much does not address through his Declaration. Much was one of the key

---

[2] Despite Much's attempt to minimize the level of his role at Plaintiff, he was indisputably involved in some of the highest-level meetings and strategies there. Furthermore, he regularly communicated with Care Enablement's CEO directly, including about highly confidential issues and strategies for strategic projects within Care Enablement. Turk Dec. ¶ 6. In fact, Much had so much access to him that he considered him to be a mentor. *Id.* at ¶ 7.

[3] The existence of public information about FME does not detract from its protectable interest in maintaining confidentiality of strategies and overall planning process. *See Iconics, Inc. v. Massaro*, 266 F. Supp. 3d 449, 457 (D. Mass. 2017); *EMC Corp. v. Breen*, No. 201204477BLS2, 2013 WL 1907460, at *4 (Mass. Super. Feb. 25, 2013).

[4] With respect to Beck Dec., Ex. B, Much ignores that the group discussed confidential strategies, including the budgets and financial performance of the Americas supply chain, as well as the "Key Accomplishments", "Key Issues", "Key Deliverables" and "Strategic/Functional Plan Highlights." Beck Dec., ¶ 25, Ex. B.

[5] With respect to Lauredant Dec., Ex. B, Much ignores the larger issue that this presentation was from the ASC Strategy Leadership Offsite meetings he led in June in Waltham to identify and prioritize a three- to five-year plan for the organization. Lauredant Dec., ¶¶ 7-14, Ex. B. This contained substantially more confidential strategic information than that which he even attempts to address, including far more than just the project he referenced. *Id*.

[6] With respect to Melancon Dec., Ex. B, the Opposition points to just a single slide from the presentation, but even if the concept of outsourcing was public, that does not mean other information in the presentation was not confidential (as Much himself designated it); it was.

stakeholders of the PD Turnaround Project – not an occasional guest. Melancon Dec. ¶¶ 9-17. The Court should also not credit Much's self-serving and suddenly questionable memory about key strategic information to which he was regularly privy. Much is a highly paid executive who should not be permitted to "feign ignorance." *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 43 (2d Cir. 1999) (former employees cannot feign ignorance of identities of contact persons). Much is forced to argue he "doesn't remember" because he knows his anticipated duties at Vantive overlap with FME's confidential information that he was privy to – and that he would inevitably disclose if permitted to work in this role for Vantive.

Further, Much does not deny he exploited his access to FME's confidential information while planning to join Vantive. Instead, he incredulously tries to blame FME for giving him the opportunity to do so, claiming he told Joseph Turk, Jr. ("Turk"), CEO of Care Enablement, in May that he was exploring an opportunity with Vantive and that FME did not remove his access at that time. Opp. 1, 5-6. While Much admits Turk asked him to discontinue his Vantive discussions (and does not suggest he refused the request to Turk), Much neglected to disclose that Turk expressly told him at that time he could not accept a position with Vantive because it was prohibited by his noncompetition obligations. Turk Dec. at ¶¶ 3-5. Much never mentioned anything further to Turk about potential employment with Vantive. *Id.* Turk therefore believed Much stopped pursuing a potential job with Vantive, and did not otherwise learn that was not the case until after Much provided his notice of resignation to FME on July 16, 2026.[7] *Id.*

Much was fully aware of his actions at the time and must now accept responsibility. He was told he could not join Vantive due to his noncompetition obligations; he then hid his Vantive plans while continuing to exploit his access to FME's confidential information in preparation for

[7] Regardless, Much continued to be an employee, owing Plaintiff a duty of loyalty. Employers should not be required to terminate an employee when they, like Much here, attempt to negotiate a new position unsuccessfully.

his role with Vantive. That Much is "test[ing] the limits of the covenants does not inspire confidence that there will not be future efforts to do so." *EMC Corp.*, 2013 WL 1907460 at * 7.

## IV. **The Agreements Satisfy the MNAA's Requirements**

Understanding the Agreements prohibit his planned role with Vantive, Much argues they are unenforceable based on a technical argument under the MNAA. Contrary to his assertion, the Agreements are in fact between and signed by Much and Plaintiff. Much's reliance on *Anaplan Parent, LP v. Brennan*, No. 2584CV02350 (Mass. Super. Ct. Sept. 15, 2025), an unreported trial-level decision currently under review by the Supreme Judicial Court that is not binding on this Court, *see King v. Order of United Commercial Travelers of Am.*, 333 U.S. 153, 159-62 (1948) (rejecting an unreported state trial court decision as binding on federal courts), is misplaced.

Unlike *Anaplan*, the Agreements make clear they were entered into between Much and Plaintiff, specifically stating "Employer and I expressly agree . . ." and defining the term "Employer" as the "subsidiary of Fresenius Medical Care Holdings, Inc." that Much commenced employment with – *i.e.*, Fresenius USA Manufacturing, Inc. *See* Agreements p. 1; Rich Dec. ¶¶ 3-7; Much Dec. ¶ 1. Much admits he commenced his employment with Plaintiff and does not otherwise contend in his Declaration he was ever confused about who his employer was or about any scope of his restrictions. The Agreements are also each signed "On behalf of the Employer," and the corporate signatories thereto were authorized to sign, and did in fact sign, on behalf of Plaintiff. Rich Dec. ¶¶ 3-7. The Agreements clearly meet the MNAA's signature requirements.[8]

[8] Even if the Court were to find that Plaintiff was not a signatory to the Agreements (despite its signatures under "Employer"), Much's reliance on *Anaplan* is still unavailing because it was wrongly held. *Anaplan* adopted an unduly narrow construction of the term "employer" by relying on the "ordinary definition" of the word which cannot be reconciled with the plain language of the MNAA. As the Legislature broadened the definition of "employee" beyond its ordinary meaning, *Anaplan* was incorrect to simultaneously rule it also intended to apply the narrowest possible definition of "employer." The term should be construed functionally and in harmony with the broader statutory scheme. *See, e.g., Cynosure LLC v. Reveal Lasers LLC*, No. 22-cv-11176-PBS, 2022 WL 18033055, at *6-9 (D. Mass. Nov. 9, 2022) (parent-company equity agreement before the Court for a different defendant complied

## V. <u>The Scope of the Agreements' Restrictions and the Requested Injunction are Proper</u>

The Opposition again relies on *Anaplan* to argue the scope of the Agreements' noncompetition restrictions extend beyond that permitted by the MNAA. This fails for the same reasons above. In any event, Much's position is purely theoretical and ignores the reality presented in this case. Here, Plaintiff – not some other corporate entity – is bringing this action and seeking to enforce its Agreements to protect its legitimate business interests (exactly as provided for under the MNAA). The fact that the Agreements, which include other covenants beyond just the noncompetition restrictions, include a separate definition of "Company" that references Plaintiff and affiliated companies, does not detract from this.[9] The Agreements' noncompetition restrictions are tailored in scope to Much's responsibilities with Plaintiff, and Plaintiff has pursued this action based on those restrictions and the confidential information and trade secrets that Much was actually privy to. In short, this action, the Agreements' noncompetition restrictions and the requested injunction are directly tailored to protect Plaintiff's legitimate business interests.[10]

The Opposition (p. 12) emphasizes that Plaintiff overreaches by seeking to prevent Much from working for Vantive in any capacity anywhere in the world. That is a purely theoretical, and irrelevant, argument. Plaintiff brought this action based on Much's *actual* duties and responsibilities with Vantive (not theoretical ones) that directly overlap with his duties and responsibilities for Plaintiff, and those that he admittedly will be performing from Texas (not

---

with the MNAA). Furthermore, Much's interpretation would create an inequitable windfall after he received the significant benefits for the covenants he now seeks to escape.

[9] The scope of the Agreements' confidentiality and non-solicitation provisions are irrelevant to this argument as those are not noncompetition agreements subject to the MNAA's requirements.

[10] Even if the Court were to determine the Agreements' restrictions were broader than necessary to protect Plaintiff's legitimate business interests (they are not), the restrictions should not be invalidated, but instead be revised to the extent necessary to be valid and enforceable – both per the Agreements as well as the MNAA. *See* Agreements, § 7 (any unenforceable portion "*shall* be judicially modified or amended (or otherwise interpreted) to the fullest extent permitted by law") (emphasis added); M.G.L. c. 149, § 24L(d) (allowing the court to blue-pencil noncompetition agreements). Moreover, Much's citation to other states' trial court decisions is inapposite. Massachusetts courts have long enforced agreements including protections for affiliates. *See, e.g., Cynosure LLC*, 2022 WL 18033055 at *6-9.

another theoretical location) where he was also based during his employment with Plaintiff. Noncompetition covenants are to be analyzed "in light of the facts in each case." *Boulanger v. Dunkin' Donuts, Inc.*, 442 Mass. 635, 639-40 (2004). The issue before this Court is not what should happen if Much theoretically took other jobs in other locations across the globe; the issue is what should happen during the pendency of the lawsuit with respect to Much remaining employed by Vantive, Plaintiff's direct competitor, in the particular role he accepted.

Much is free to use his decades of general supply chain experience to explore other jobs; he just cannot take the confidential information and trade secrets he learned at Plaintiff – his first job in the healthcare industry – to join its primary competitor in a directly competitive capacity.

## VI. Much's Suggestion of Undue Delay is Frivolous

Much grossly mischaracterizes the sequence of events at the end of his employment, suggesting Plaintiff ignored him and engaged in undue delay before filing this action and seeking injunctive relief. In truth, Much informed Plaintiff on July 16, that he would resign effective July 30, giving Plaintiff no reason to believe he would be commencing employment with Vantive until at least July 30. Yet on the afternoon of Friday, July 24, Much abruptly and unilaterally accelerated his resignation to be effective immediately. Much Dec. Ex. A. On the very next Monday, July 27, Plaintiff's counsel sent Much (and Vantive) a letter concerning Much's post-employment obligations and Plaintiff's concerns about his potential Vantive employment. Siegel Dec. ¶ 2, Ex. A. It was not until late in the afternoon on Friday, July 31, that Plaintiff's counsel received a response from Much's counsel which still did not unequivocally state Much had commenced employment with Vantive (even though he apparently had, unbeknownst to Plaintiff). *Id.* ¶ 4, Ex. C. The fact that Plaintiff took three business days after receiving opposing counsel's response to prepare and file its Complaint and related motion papers is hardly an indicium of undue delay. It certainly has no bearing on Plaintiff's ability to demonstrate irreparable harm. *See N.E. Controls,*

*Inc. v. Pilsbury*, No. 18-CV-10583-DJC, 2018 WL 3150223, at *8 n. 3 (D. Mass. June 27, 2018) (56-day delay before seeking injunctive relief is not undue delay impacting irreparable harm).

**VII. <u>Much's Alleged Remediation Efforts Do Not Detract from His Breaches</u>**

The Opposition claims that Much did not physically take any FME property and undertook certain remediation efforts with respect to FME's confidential information and trade secrets. Plaintiff does not concede this to be true as its ongoing investigation has already revealed some concerning issues and it has no real insight into Much's supposed efforts, including the files he originally took on his personal devices, beyond the basic information identified through the Opposition. Regardless, even if Much did not physically take any confidential information, and even if he and Vantive take sincere efforts to protect the integrity of FME's trade secrets, efforts which "lack the force of law," that does not alter the fact that Plaintiff is likely to succeed on its claim Much breached the Agreements. *Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 129–30 (D. Mass. 2011) ("even if these scrupulous efforts are wholly successful, they will merely reduce the harm that will flow from [the] breach of the Agreement; they will not erase the fact of the breach."); *Marcam Corp. v. Orchard*, 885 F. Supp. 294, 297 (D. Mass. 1995); *SimpliVity Corp. v. Moran*, No. 142133, 2016 WL 5122671, at *11 (Mass. Super. Aug. 14, 2016).

**VIII. <u>Plaintiff Is Likely to Succeed on the Merits of its MTSA and DTSA Claims</u>**

The Opposition claims "Plaintiff has not sufficiently pleaded Much's access to actual trade secrets." p. 17. This is demonstrably incorrect. As noted above, Plaintiff has submitted a substantial amount of evidence concerning its confidential information and trade secrets, most of which, the Opposition has ignored entirely. That evidence more than sufficiently demonstrates Much's access to Plaintiff's trade secrets. *See, e.g.*, M.G.L. c. 93 § 42(4) (defining "trade secret" to include "specified or specifiable information, whether or not fixed in tangible form or embodied in any tangible thing, including but not limited to a … method, technique, process, business strategy, …

[or] invention …"); *see also LightForce Orthodontics, Inc. v. Align Tech., Inc.*, No. 25-MC-91583-AK, 2026 WL 1133400, at *4 (D. Mass. Apr. 27, 2026) ("Courts consistently hold that material related to a company's strategy, including competitive and market analyses, are trade secrets or confidential commercial information."). In short, Plaintiff clearly identified valid trade secrets that Much has *already* misappropriated by continuing to gain access when he was fully aware that he would be leaving to join Vantive in a directly competitive capacity in violation of the Agreements.

The Opposition also contends the requested injunction is prohibited by the DTSA. Even if the DTSA does not provide an independent basis for injunctive relief, the Court still can, and should, issue the injunction based on the breach of contract and MTSA claims. *See President & Fellows of Harvard Coll. v. US Dep't of Homeland Sec.*, 788 F. Supp. 3d 182, 209 (D. Mass. 2025) (a "plaintiff need only establish a likelihood of succeeding on the merits of any one of [its] claims for a preliminary injunction to be granted.") (quotation omitted).

The Opposition also argues the MTSA cannot apply because Much is in Texas. At the outset, Plaintiff's trade secret claims are governed by Massachusetts law because Much entered the Agreements which govern trade secret issues and include a Massachusetts choice of law provision. *See* Agreements § 7. *See, e.g., DraftKings Inc. v. Hermalyn*, 732 F. Supp. 3d 84, 107 (D. Mass.), *aff'd*, 118 F.4th 416 (1st Cir. 2024). Plaintiff has also demonstrated that Much engaged in substantial misconduct related to its trade secrets in Massachusetts, including when he led the ASC Strategy Leadership Offsite meetings at FME's headquarters in Waltham, Massachusetts in June 2026 – all while knowing he was going to Vantive. This is sufficient to establish Much's misconduct regarding trade secrets in Massachusetts.

**IX. <u>Conclusion</u>**

For the reasons set forth above, and in Plaintiff's prior submissions, the Court should grant Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction.

Respectfully submitted,

FRESENIUS USA MANUFACTURING, INC.

By its attorneys,

*/s/ Sean P. O'Connor*
Jeffrey S. Siegel (BBO# 647148)
Sean P. O'Connor (BBO# 673835)
Robert Papandrea (BBO# 711504)
MORGAN, BROWN & JOY, LLP
28 State Street, 16th Floor
Boston, MA 02109
(617) 523-6666
(617) 367-3125 (fax)
jsiegel@morganbrown.com
soconnor@morganbrown.com
rpapandrea@morganbrown.com

Dated: August 20, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the ECF system on this date, and that a true paper copy of this document will be sent to those indicated as non-registered participants on the Notice of Electronic Filing by first class mail on the same date.

Dated: August 20, 2026

*/s/ Sean P. O'Connor*
Sean P. O'Connor