**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **FRESENIUS USA MANUFACTURING, INC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**MICAH MUCH,**<br><br>**Defendant.** | ) | **Case No. 26-cv-13572-DJC** |

**MEMORANDUM AND ORDER**

**CASPER, C.J.** **August 31, 2026**

## I. Introduction

This matter comes before the Court on a motion for a temporary restraining order ("TRO") and preliminary injunction of Plaintiff, Fresenius USA Manufacturing, Inc. ("Fresenius"), a subsidiary of Fresenius Medical Care Holdings, Inc. ("FME"). D. 3. Pursuant to Federal Rule of Civil Procedure 65, Fresenius seeks to enjoin its former employee, Defendant Micah Much ("Much") by enforcing the provisions of its Employee Confidentiality, Assignment and Protective Covenants Agreements ("Agreements") with Much. Id.; D. 5 at 2. For the reasons stated below, the Court ALLOWS Fresenius's motion, D. 3.

Fresenius filed its complaint on August 5, 2026, D. 1, and sought preliminary relief that same day, D. 3. Fresenius seeks preliminary relief due to Much's recent employment with its direct competitor, Vantive US Healthcare LLC ("Vantive"), D. 5 at 2. In his opposition, D. 41,

Much argues that the Agreements' noncompetition provisions are unenforceable under the Massachusetts Noncompetition Agreement Act ("MNAA"), Mass. Gen. L. c. 149, § 24L(b), that Fresenius's substantive claims fail as a matter of law and that Fresenius cannot establish irreparable harm, id. at 6-7. The Court heard arguments from the parties and took the pending motion under advisement. D. 50.

## II. Standard of Review

"[A]llowance of a TRO, as with a preliminary injunction, is an extraordinary and drastic remedy that is never awarded as of right." Allscripts Healthcare, LLC v. DR/Decision Res., LLC, 592 F. Supp. 3d 1, 3 (D. Mass. 2022) (internal citation and quotation marks omitted). To obtain any form of preliminary injunctive relief, a plaintiff "must demonstrate: 1) a substantial likelihood of success on the merits, 2) a significant risk of irreparable harm if the injunction is withheld, 3) a favorable balance of hardships, and 4) a fit (or lack of friction) between the injunction and the public interest." Chiang v. Skeirik, 529 F. Supp. 2d 166, 172 (D. Mass. 2007) (citing Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003)); see NuVasive, Inc. v. Day, 954 F.3d 439, 443 (1st Cir. 2020). The likelihood of success on the merits is the "critical" factor in the analysis. Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993).

## III. Factual Background

In deciding a motion for a preliminary injunction, "the Court may accept as true well-pleaded allegations in the complaint and uncontroverted affidavits." D.V.D. v. U.S. Dep't of Homeland Sec., 778 F. Supp. 3d 355, 386-87 (D. Mass. 2025) (internal citation and quotation marks omitted).

**A. FME and Fresenius**

FME and its global affiliates provide products and services to people with chronic kidney failure, D. 1 ¶ 6, and distribute "a comprehensive range of medical devices, related supplies and renal pharmaceuticals" to dialysis patients, id. ¶ 8. Millions of individuals with chronic kidney failure regularly undergo dialysis treatment, which is a blood cleansing procedure that substitutes for the function of the kidney in the case of kidney failure. Id. ¶ 6. Among the types of treatments FME provides, peritoneal dialysis ("PD") can be performed in a patient's home daily, id. ¶ 7, which necessitates a unique system of manufacturing, storage and delivery, see D. 10 ¶ 11; D. 11 ¶ 10.

Care Enablement is an "organizational division" within FME that "centralizes its healthcare products business, including research and development, manufacturing, supply chain and commercial operations as well as supporting functions, such as regulatory and quality management." D. 1 ¶ 9. Vantive is Care Enablement's primary and direct competitor in the PD business for in-home patients. Id. ¶ 10; D. 11 ¶ 9; D. 12 ¶ 14.

Much describes Care Enablement as one of FME's three separate business divisions, D. 42 ¶ 17, that is responsible for manufacturing and distributing products used by Fresenius's customers, id. ¶ 20. He further describes his role as "within the Care Enablement division at Fresenius Manufacturing." Id. ¶ 24.

**B. Much's Role and Responsibilities at Fresenius**

Fresenius hired Much on September 30, 2022, as its "Vice President North America Supply Chain," and later updated Much's job title to "Vice President Supply Chain Americas" on January 5, 2025. D. 9 ¶ 14. He used an email address with the domain name

"@freseniusmedicalcare.com" and referred to himself as the "Vice President, Supply Chain Americas Care Enablement (CE), Fresenius Medical Care." D. 11-3 at 4. Much had no prior experience in the kidney care or healthcare industry before joining Fresenius, D. 9 ¶ 15, but had thirty years of supply chain leadership experience in the aerospace and defense industries, D. 42 ¶ 2. Much was a highly compensated executive at Fresenius. See D. 9 ¶¶ 17-18.

As Vice President Supply Chain Americas, Much was responsible for "the overall supply chain management for Care Enablement." D. 10 ¶ 10. He "managed the supply chain budget and oversaw the processing and delivery of products to more than 30,000 clinics, hospitals and home patients." Id. Much describes the concept of a "supply chain" as encompassing the "entire cycle" of a business from procurement, to manufacturing and demand and supply logistics, which further entails inventory management and the transportation of goods to the end customer. D. 42 ¶ 5. Due to the nature of Much's role, the FME business model and supply chain dynamics, Much interacted with the corporate departments within FME as well as outside suppliers and consultants. D. 10 ¶ 12. In essence, Much was responsible for ensuring Care Enablement's products were available to customers, stocked and delivered in a timely manner throughout the Americas. Id.

Fresenius provides several examples of confidential information Much had access to by virtue of his role and through discussions, projects and meetings with other FME executives. For one example, on May 21, 2026, Much spoke at an Executive Manufacturing Supply Chain Project Review meeting about two projects he was leading. Id. ¶ 18. Both projects were confidential and involved strategies to change delivery methods and control costs for future "enterprise transformations," id., and other projects not known to the public involving future FME products were discussed at the same meeting, id. ¶ 20.

Much was also "an integral participant and leader" of the executive meetings for sales, inventory and operations planning ("SIOP") that met monthly to discuss FME's overall supply chain network and costs. Id. ¶ 22. Much describes SIOP as "a cross-functional business process that brings together personnel from commercial, finance, procurement, manufacturing, and logistics to determine how the organization will satisfy its product demand." D. 42 ¶ 11. Much presented an "Americas Supply Chain Operational Assessment" slide show at the June 2026 SIOP meeting before various leaders across FME where he addressed "[e]xecutive focus on decisions needed and top risks reviewed." D. 10-1; D. 10-2; D. 10 ¶ 23.

Fresenius also emphasizes the role Much played in the "PD Turnaround Project," which it describes as "a high-level corporate priority project . . . with the express purpose of focusing on FME's peritoneal dialysis (PD) business for in-home patients . . . for which Vantive is one of FME's biggest competitors." D. 11 ¶ 9. Much and leaders from other FME divisions met quarterly to discuss the PD Turnaround Project and addressed strategies related to supply chain, manufacturing and commercial sales issues including future products, launch strategies, market and growth analyses, vendor relationships and FME's strengths and weaknesses in the PD business. Id. ¶ 10. The June 2026 PD Turnaround Project meeting specifically discussed "strategies about competing with Vantive such as with respect to pricing, costs, market share and product analyses." Id. ¶ 16.

Lastly, Much engaged with FME customers and vendors on behalf of Fresenius. For example, in April 2026, Much participated in a tour of a FME distribution center in Dallas, Texas with FME's customer, DaVita Kidney Care. Id. ¶ 19. Later that month, Much planned and led a larger tour for DaVita executives through another FME distribution center in Aurora, Colorado.

Id. ¶ 20.

### C. The Agreements

In connection with FME's long-term incentive plan, Much executed a series of substantially identical Agreements dated November 28, 2022, August 1, 2023, July 25, 2024 and July 28, 2025, respectively. D. 1 ¶ 28; D. 9 ¶ 19; D. 41 at 12 n.1. For executing the Agreements, Much received a payout of $82,778 and incentive grants of $110,000, $118,000 and $115,000, respectively. D. 9 ¶ 22.

Each agreement states that it does not supersede prior restrictive covenants between the parties addressing "post-employment obligations, such as agreements concerning nondisclosure of Confidential Information or Trade Secrets, nonsolicitation, noncompetition and intellectual property." D. 1 ¶ 30; D. 1-2 at 11 § 10. The Agreements include several provisions relevant here, including that Much would not use or disclose any confidential information and that he would return all of FME's property (including electronic information) upon termination of his employment. D. 1 ¶ 31; D. 1-2 at 2-3 § 3. Furthermore, the Agreements prohibit Much for twelve months following the termination of his employment from working for or in furtherance of any "Competing Business" within the "Restricted Area" under circumstances where his "duties, services, and/or responsibilities are the same as or substantially similar to any of the duties and responsibilities" performed for Fresenius during the look back period. D. 1 ¶ 32; D. 1-2 at 7 § 5(b).

### D. Much's Resignation and Move to Vantive

Much started interviewing with Vantive in or about May 2026. D. 42 ¶¶ 59, 61. On June 10, 2026, Much returned his Fresenius-issued cell phone and informed the company that he would

be using his personal phone for business thereafter. D. 1 ¶ 36; D. 42 ¶ 67. On June 15, 2026, Much received a verbal job offer from Vantive, and he negotiated the terms of that offer before receiving a formal written job offer on July 14, 2026. D. 42 ¶ 63. Much continued to work at Fresenius and submitted his formal resignation notice on July 16, 2026, days after receiving his second retention bonus of $70,000. D. 1 ¶ 38; D. 42 ¶ 64. In connection with his resignation, Much informed Fresenius that he had accepted an executive-level position with Vantive and would be responsible for overseeing Vantive's global logistics and supply chain operations, among other duties. D. 1 ¶ 40; D. 42 ¶ 64. Much originally submitted an end date of July 30, 2026, but later left on July 24, 2026, D. 1 ¶ 39; D. 42 ¶ 66.

Much started at Vantive on July 28, 2026, as its Executive Vice President and Chief Supply Chain Officer. D. 42 ¶ 72. He is a member of Vantive's senior executive leadership team and he reports directly to Vantive's CEO. Id.

## IV. Discussion

Fresenius alleges that Much has breached the Agreements by providing services, or planning to provide services, to Vantive in his new role, D. 1 ¶¶ 53-59; that Much has violated the Massachusetts Trade Secrets Act ("MTSA"), Mass. Gen. L. c. 93, §§ 42, 42A-42G, D. 1 ¶¶ 60-72, and that Much has violated the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, D. 1 ¶¶ 73-86.

### A. The Agreements are Valid and Enforceable under the MNAA

The Agreements contain a Massachusetts choice of law provision, D. 1-1 at 9 § 7, and the parties do not dispute that Massachusetts law governs their contract dispute. The MNAA "governs the enforceability of noncompetition agreements, like [Much's], entered into on or after

October 1, 2018." DraftKings Inc. v. Hermalyn, 732 F. Supp. 3d 84, 109 (D. Mass. 2024) (citing Automile Holdings, LLC v. McGovern, 483 Mass. 797, 807 n.15 (2020)), aff'd, 118 F.4th 416 (1st Cir. 2024). A "valid and enforceable" agreement:

> (i) must be in writing, be signed by employer and employee, and state that the employee has the right to consult with counsel before signing; (ii) must be supported by fair and reasonable consideration independent from the continuation of employment if signed after commencement of employment, and provide the employee with ten business days' notice before becoming effective; (iii) must be no broader than necessary to protect the employer's trade secrets, confidential information, or goodwill, each of which constitute legitimate business interests; (iv) may not exceed twelve months from the last day of employment, unless the employee has breached a fiduciary duty or unlawfully taken property belonging to the employer, in which case the agreement may not exceed two years from the last day of employment; (v) must be reasonable in geographic reach in relation to the interests protected; (vi) must be reasonable in the scope of proscribed activities in relation to the interests protected; (vii) must be supported by a garden leave clause or other mutually-agreed upon consideration between the employer and the employee; and (viii) must be consonant with public policy.

Id. (internal quotation marks omitted) (quoting Mass. Gen. L. c. 149, §§ 24L(b)(i)-(viii)). Much contends, as a threshold issue, that the Agreements Fresenius seeks to enforce do not comply with the first and third MNAA criteria. D. 41 at 14-17.[1]

For the first criteria, Much does not dispute that the Agreements are in writing, signed by him and inform him of his right to consult with counsel. See D. 41 at 14-17; D. 1-1 at 10-11. Much, however, argues that the Agreements are unenforceable because the name of his specific

[1] Much contends in a single sentence of his opposition that Fresenius's requested injunction "is a wild overreach that goes beyond what their own agreement permits and is expressly prohibited by the MNAA." D. 41 at 17. To the extent that Much is referring to the geographic scope of the Agreements and suggesting that it violates the MNAA, the Court concludes that the Agreements define the "Restricted Area" as the geographic areas where FME conducts business and where Much "provided services or had a material presence or influence," D. 1-1 at 6 § 5(a)(vi), which complies with the MNAA's requirement that a noncompetition agreement "be reasonable in geographic reach in relation to the interests protected," Mass. Gen. L. c. 149, § 24L(b)(v); see DraftKings, 732 F. Supp. 3d at 110 (applying this provision of the MNAA).

"employer," Fresenius USA Manufacturing, does not appear in the Agreements and Fresenius did not sign the Agreements. D. 41 at 14-17; see D. 1 ¶¶ 12, 53; Mass. Gen. L. c. 149, § 24L(b)(i). Fresenius disputes this characterization because the Agreements refer to Much's "Employer" which both parties recognize was Fresenius. D. 47 at 7.

The Agreements are signed by two individuals "[o]n behalf of the Employer" — Brian Silva, "Head, Global Human Resources," signed the first three Agreements, D. 1-1 at 11; D. 1-2 at 12; D. 1-3 at 12, and Michael Dunleavy, Jr., "SVP Global Total Rewards," signed the fourth Agreement, D. 1-4 at 13. Each Agreement defines "the Employer" in its first paragraph as "a subsidiary of Fresenius Medical Care Holdings, Inc." that employed Much at the time of execution. D. 1-4 at 2. Furthermore, each Agreement provides prior to its substantive provisions that "[b]y signing below, the Employer and [Much] expressly agree, as follows." Id.

Only one specific subsidiary of FME employed Much, Fresenius USA Manufacturing. D. 42 ¶ 16. In its Rule 7.1 corporate disclosure statement, Fresenius (specifically, Plaintiff Fresenius USA Manufacturing, Inc.) states that it is "an indirect subsidiary of Fresenius Medical Care Holdings, Inc." which itself is "an indirect, wholly owned subsidiary of its ultimate parent company Fresenius Medica Care AG." D. 2 at 1. The Agreements' reference to "a subsidiary of Fresenius Medical Care Holdings, Inc." that employed Much, D. 1-4 at 2, sufficiently implicates his specific employer rather than the broader FME parent company. Cf. Moura v. Cannon, No. 17-cv-40166-TSH, 2021 WL 4422964, at *9 (D. Mass. Sept. 27, 2021) (concluding an alternate employer was liable for workers' compensation based on the parties' relationship even though the alternate employer was "not specifically named" in the written agreement). Likewise, both Silva and Dunleavy signed the Agreements "[o]n behalf of the Employer," and had authorization to

execute the Agreements on behalf of Fresenius. D. 49 ¶¶ 6-7; see Dolben v. Gleason, 292 Mass. 511, 514 (1935) (stating that "[a] contract made by the authorized agent of a corporation is the corporation's contract").

Much cites Anaplan Parent, LP v. Brennan, No. 2584-cv-02350 (Mass. Super. Ct. Sept. 15, 2025), appeal docketed, No. SJC-13917, as persuasive support that the Agreements must be signed by Fresenius specifically. D. 41 at 16. That case differs from the alleged facts here since the former employee there entered into an equity grant agreement including a noncompetition provision directly with the parent company and not with the defendant's employer. Thus, the Superior Court's reasoning for concluding that the agreement was unenforceable under the MNAA, see Anaplan Parent, LP v. Brennan, No. 2584-cv-02350, at 9 (focusing on the "general and well-established doctrine of corporate separateness") is inapposite here, where, by the very terms of the Agreements, Much entered the Agreements with his employer. D. 1-4 at 2; see Anaplan Parent, LP v. Brennan, No. 2584-cv-02350, at 10 (noting that the "signature requirement plainly seeks to ensure that there is concrete evidence that employer and employee entered into a binding non-compete agreement and thereby assumed reciprocal obligations under the statute").

As for the third criteria — that the contract be "no broader than necessary to protect" specific "legitimate business interests of the employer," Mass. Gen. L. c. 149, § 24L(b)(iii) — Much contends that the Agreements' inclusion of confidential information and trade secrets belonging to "the Company" and preclusion of employment by competitors of "the Company" goes beyond protecting Fresenius's legitimate business interests. D. 41 at 14-17. Fresenius argues the Agreements are no broader than necessary to protect FME's interests, D. 5 at 13, which it defines as including "Plaintiff Fresenius USA Manufacturing, Inc., and its parent

company Fresenius Medical Care Holdings, Inc. and any related affiliate," id. at 2 n.2. Fresenius further argues that the specific facts of this case and the Agreements demonstrate that the noncompetition restrictions are tailored in scope to Much's duties and responsibilities with Fresenius, which is permissible under the MNAA. D. 47 at 8.

The MNAA requires noncompetition agreements to be "no broader than necessary to protect" specific "legitimate business interests of the employer," which include the employer's trade secrets, confidential information and goodwill, see Mass. Gen. L. c. 149, § 24L(b)(iii), and it does not define "employer." Anaplan Parent, LP v. Brennan, No. 2584-cv-02350, at 5. The Court, however, disagrees with Much's contention that the MNAA's reference to protecting the "legitimate business interest of the employer" makes the Agreements between him and Fresenius unenforceable.

The reasonableness of a noncompetition agreement's scope must be assessed "in light of the facts in each case." DraftKings Inc., 732 F. Supp. 3d at 110 (internal citation and quotation marks omitted). Here, the noncompetition provisions of the Agreements restrict Much from working "in circumstances where [his] duties, services, and/or responsibilities are the same as or substantially similar to any of the duties and responsibilities [he] performed for the Company." D. 1-1 at 7 § 5(b). While the scope of the noncompetition provisions reference the broader FME entity, id. 2 §1, it is nevertheless limited to the duties and responsibilities Much actually performed. On this basis, Much's Agreements differ from those deemed unenforceable by the Delaware courts in the cases he cites. D. 41 at 16. Specifically, the Court of Chancery of Delaware concluded that a noncompetition agreement "including the employer's affiliates is not tailored to the employer's role while employed, and the inclusion of affiliates in different sectors and different

countries is not essential to the protection of the employer's legitimate business functions." Fortiline, Inc. v. McCall, No. 2024-0211-MTZ, 2024 WL 4088629, at *4 (Del. Ch. Sept. 5, 2024) (internal quotation marks and citation omitted); Kodiak Bldg. Partners, LLC v. Adams, No. 2022-0311-MTZ, 2022 WL 5240507, at *11 (Del. Ch. Oct. 6, 2022) (holding an agreement unenforceable for extending to "other segments of Kodiak's business" where the former employee did not work and could not access confidential information). Much's Agreements, by contrast, focus on his role and duties while employed by Fresenius, thereby protecting the business interests of his former employer.

By restricting the noncompetition provision to Much's duties and responsibilities, the Agreements are not broader than necessary to capture Much's role within the FME ecosystem. See DraftKings, 732 F. Supp. 3d at 109-10 (comparing the scope of the noncompetition agreement to the employee's role). Much interacted with all corporate divisions within Care Enablement, "was privy to confidential information and trade secrets of the entire FME organization," D. 11 ¶ 6; D. 10 ¶ 15, and described his role as "a referee between the commercial, finance, and manufacturing teams, facilitating consensus regarding production, inventory, and deployment decisions," D. 42 ¶ 35. The Agreements are tailored to Much's role at Fresenius and, therefore, are not broader than necessary to protect the legitimate business interests that Much was privy to, see DraftKings, 732 F. Supp. 3d at 109-110; see also Cigna Corp. v. Bricker, 103 F.4th 1336, 1344 (8th Cir. 2024) (affirming preliminary injunction enforcing a noncompetition agreement where the employee was the president of a major subsidiary of the parent corporation, Cigna, and privy to protected information "touching all aspects of Cigna's business").

Accordingly, the Court concludes that the Agreements are valid and enforceable under the

MNAA.

### B. Fresenius Has Shown a Likelihood of Success that Much Breached the Agreements

Fresenius must demonstrate a likelihood of success as to whether Much breached the Agreements by working at Vantive. Much claims that he has not breached the Agreements because his "responsibilities at Vantive are materially different from his prior role at Fresenius Manufacturing." D. 41 at 18. Fresenius contends that there is no dispute Much's duties and responsibilities at Vantive would at least overlap with those he had at Fresenius, which is all that is required to conclude he has breached the Agreements. D. 47 at 3.

The language of the Agreements bars Much from "work[ing] for or in furtherance of any Competing Business within the Restricted Area in circumstances where [Much's] duties, services, and/or responsibilities are the same as or substantially similar to any of the duties and responsibilities" he performed for FME. D. 1-1 at 7 § 5(b). Much acknowledges that he "will have some responsibility for logistics functions at Vantive," but says that he will be focusing on "driving continuity, strategy, and excellence across Vantive's supply chain functions including demand planning and logistics." D. 41 at 18. These duties and responsibilities resemble those he had at Fresenius. D. 10 ¶ 10; D. 42 ¶ 27. Much's work for Vantive, while more expansive, is substantially similar to at least some of the duties and responsibilities he had with Fresenius in the past two years. See Cynosure LLC v. Reveal Lasers LLC, No. 22-cv-11176-PBS, 2022 WL 18033055, at *10 (D. Mass. Nov. 9, 2022) (concluding that a former employer had demonstrated a likelihood of success in proving that employees would be providing services to a competitor that violated the agreement, despite being "not exactly the same" services). The Agreements prohibit Much from performing "any of the duties and responsibilities" he performed for Fresenius in the

Americas, therefore, his additional duties relating to Vantive's procurement and manufacturing or his work in other regions of the world do not rebut the showing of a likelihood of success on the claim by Fresenius that his conduct breaches the Agreements. See Nat'l Med. Care, Inc. v. Sharif, No. 20-cv-11460-MBB, 2020 WL 6318922, at *7, 14 (D. Mass. Sept. 2, 2020) (concluding a defendant's new position included a "broader range of duties" but nevertheless breached the noncompetition agreement for also including substantially similar duties).

As Fresenius's declarations reflect, D. 11 ¶ 16; D. 10 ¶¶ 28-29, and Much's declaration from Vantive Chief Transformation Officer, James Prutow, acknowledges, D. 43 ¶¶ 6-7,17, Vantive is a direct competitor of FME in areas that Much has knowledge of FME's confidential information and strategies, see D. 48 ¶ 6; Aspect Software, Inc. v. Barnett, 787 F. Supp. 2d 118, 129 (D. Mass. 2011). In short, Fresenius has shown it reasonably likely that Much, in going from Vice President, Supply Chain for the Americas at Fresenius to Executive Vice President and Chief Supply Chain Officer at Vantive, will engage in some of the same or substantially similar duties in violation of the Agreements.[2]

**C. Fresenius Would Suffer Irreparable Harm Absent Injunctive Relief**

"Irreparable harm is 'an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy.'" Nat'l Med. Care, 2020 WL 6318922, at *14 (quoting Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 76 (1st Cir. 2005)). "A finding of irreparable harm is . . . triggered where the defendant has likely violated his noncompetition agreement."

[2] In light of the Court's conclusion that Fresenius has shown a likelihood of success on its breach of contract claim, the Court does not address the merits of the motion regarding Fresenius's MTSA and DTSA claims. See Nat'l Med. Care, 2020 WL 6318922, at *16 n.19.

DraftKings, 732 F. Supp. 3d at 120 (collecting cases). Moreover, Much stipulated in the Agreements that "any breach of this Agreement will cause the Company substantial and irreparable damage," D. 1-1 at 9 § 6, further supporting the existence thereof, see DraftKings, 732 F. Supp. 3d at 120 (relying on a similar acknowledgement in the employee's noncompetition agreement).

The present record demonstrates that Much had an extensive role overseeing FME's supply chain logistics and strategies in the Americas. In the months leading up to his resignation, Much led and attended several executive meetings discussing FME's plans for improving its supply chain in the Americas and at least one meeting discussing Fresenius's strategies about competing with Vantive in the PD business. D. 10 ¶ 23; D. 11 ¶¶ 9-10, 16. Vantive hired Much to "driv[e] continuity, strategy, and excellence across Vantive's fulfillment/logistics functions." D. 43 ¶ 11. It follows that Much will use his knowledge of FME's supply chain and strategies to the benefit of his former employer's direct competitor. See CVS Pharmacy, Inc. v. Lavin, 951 F.3d 50, 59 (1st Cir. 2020) (stating that it "strains credulity to think that a top-echelon executive . . . could develop a strategy for [a competitor] without dipping into" his extensive knowledge of his former employer's strategic initiatives and business relations).

Much contends that Fresenius cannot demonstrate irreparable harm because it knew that he was considering a role with Vantive in May 2026 yet left him in his role at Fresenius without restriction until he resigned. D. 41 at 24-25. Even putting aside any evidence that Care Enablement CEO, Joseph Turk, asked Much to stop pursuing any position with Vantive in May 2026, D. 42 ¶ 59; D. 48 ¶¶ 3-4, Much did not inform Fresenius that he accepted a role with Vantive until July 16, 2026 and the company withdrew his access to Fresenius's systems the same day. D. 42 ¶¶ 64-66. Much left Fresenius a week later, on Friday, July 24, 2026, id. ¶ 66, and the

following Monday counsel for Fresenius sent Much a letter reminding him of his obligations under the Agreements as they related to his employment with Vantive, D. 8 ¶ 2; D. 8-1. Fresenius sued and filed its motion for injunctive relief the following week. D. 1; D. 3. This timeline of events does not undermine Fresenius's claim of irreparable harm. Cf. Channing Bete Co. v. Greenberg, No. 19-cv-30032-MGM, 2021 WL 4691597, at *7 (D. Mass. July 21, 2021) (concluding plaintiffs delay of "at least a year . . . substantially undermines its assertion that it needs immediate relief").

Because Fresenius has shown a likelihood of success on the merits of its claim that Much violated the Agreements through his present employment with Vantive, Fresenius has shown that it would suffer irreparable harm absent injunctive relief. See DraftKings, 732 F. Supp. 3d at 120.

### D. The Balance of Harms Favors Injunctive Relief

"Balancing the harms involves examining 'the hardship to the nonmovant if enjoined as contrasted with the hardship to the nonmovant if no injunction issues.'" Nat'l Med. Care, 2020 WL 6318922, at *15 (quoting Black Tea Soc'y v. City of Bos., 378 F.3d 8, 11 (1st Cir. 2004)). Noncompetition agreements, by their nature, "impose some burden on former employees," but "that fact alone does not make such covenants unenforceable." Lombard Med. Techs., Inc. v. Johannessen, 729 F. Supp. 2d 432, 442 (D. Mass. 2010) (internal quotation marks and citation omitted).

Much voluntarily and knowingly entered into the Agreements and received the benefits conferred therein. See D. 9 ¶ 22. He retains the ability to work for companies that do not compete with his former employer, including those in his prior industries. See Cynosure LLC, 2022 WL 18033055, at *15. Further, Much stipulated in the Agreements that they "do not impose an unreasonable burden upon me or the public." D. 1-1 at 5 § 5. As discussed previously,

Fresenius will likely experience irreparable harm should Much remain in his new role with Vantive. Accordingly, the harm to Fresenius outweighs the harm to Much. See Nat'l Med. Care, 2020 WL 6318922, at *15 (reaching the same conclusion regarding a former FME employee).

### E. Public Interest Does Not Preclude Injunctive Relief

While the public interest favors affording individuals the ability to engage freely in their chosen profession, see Automile Holdings, 483 Mass. at 808, the public interest is also served by enforcing contractual obligations, including noncompetition agreements between consenting parties. Nat'l Med. Care, 2020 WL 6318922, at *16. "On balance, the public interest does not preclude allowing the preliminary injunction sought by plaintiff." Id.

## V. Conclusion

For the foregoing reasons, the Court ALLOWS Fresenius's motion for a preliminary injunction. D. 3. Accordingly, subject to the parties' filings regarding any bond as discussed below, the Court shall enter an Order of Injunction, pursuant to this Memorandum and Order and Fed. R. Civ. P. 65, that Much shall: 1) cease his current employment as Executive Vice President and Chief Supply Chain Officer at Vantive through July 24, 2027; 2) refrain from use of Confidential Information and Trade Secrets as defined in the Agreements; 3) identify and return all copies of Confidential Information and Trade Secrets as defined in the Agreements; and 4) comply with all terms of the Agreement. Fresenius has until to September 2, 2026 to file a memorandum, not to exceed five pages, providing a position about whether the Court should require a bond under Fed. R. Civ. P. 65(c) in allowing this relief. Much then has until September 4, 2026 to respond to same in a memorandum not exceeding five pages. There is nothing barring the parties from agreeing to a bond amount (or agreeing that no bond is warranted) and informing

the Court of same by September 2, 2026.

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge